

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00130-CV

JACKSON WALKER, LLP AND M. KEITH BRANYON AND JANE O. LINDSEY, INDIVIDUALLY AND AS THE FORMER CO-TRUSTEE OF THE LESEY B. KINSEL TRUST, AND ROBERT N. OLIVER, APPELLANTS

V.

VIRGINIA O. KINSEL, AS ATTORNEY-IN-FACT FOR J. FRANK KINSEL, SR., J. FRANK KINSEL, JR. , INDIVIDUALLY, CAROLE K. EDWARDS, INDIVIDUALLY, AND CATHERINE K. COLLINS, INDIVIDUALLY, APPELLEES

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-232668-08, Ken Curry, Presiding

April 10, 2015

On Motions for Rehearing

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Pending before the court are three motions for rehearing. After considering each, we withdraw our February 13, 2015 opinion and judgment, and substitute the following in its place. To the extent those motions seek relief not reflected in the following opinion, they are denied.

***Memorandum Opinion***

We have before us an appeal from a final judgment awarding damages to Virginia O. Kinsel, as attorney-in-fact for J. Frank Kinsel, Sr., J. Frank Kinsel, Jr., Carole K. Edwards, and Catherine K. Collins (collectively referred to as the Kinsels) against Jackson Walker, L.L.P., M. Keith Branyon, Jane O. Lindsey, individually and as the former co-trustee of the Lesey B. Kinsel Trust (Lindsey), and Robert N. Oliver (Oliver). The Kinsels sued Jackson Walker, Branyon (a partner in Jackson Walker), Lindsey and Oliver for fraud, tortious interference with prospective inheritance rights, and civil conspiracy, among other things. Their claims arose from the sale of a ranch owned in part by them, their predecessors, and Lesey B. Kinsel (Lesey). Allegedly, they were defrauded into selling their interests to help Lesey provide for herself, when the purportedly true motive was to secure a greater inheritance for Lindsey and Oliver. Numerous issues pend for our review, but we need not address all of them. And upon considering those which are dispositive, we reverse the trial court's judgment in part, and affirm in part as modified.

***Background***

Lesey and her husband, E.A. Kinsel, bought a ranch in Atascosa County in 1943. Though they never had children together, E.A. had four from a prior marriage. The four were J. Frank Kinsel, Sr., Joe Bob Kinsel, Alex Kinsel, and Maxine Prince. Upon his death, E.A. divided equally his one-half community interest in the ranch between Lesey and his offspring. Upon receiving the bequest from E.A., Lesey owned 60% of the ranch, and that interest was placed in her intervivos trust. According to the terms of the trust instrument, the interest would pass to E.A.'s children or heirs upon her death. The

2

plaintiffs at bar fell within that category of beneficiaries, and receiving that interest would compliment interests they or their predecessors already owned in it.

As she grew older and more frail, Lesey moved from Beaumont to Fort Worth, the latter being a locale nearer to family members. Two such family members were Lindsey and Oliver, Lesey's niece and nephew, respectively. Furthermore, Lindsey began handling some of her aunt's financial affairs upon Lesey's arrival in Fort Worth. So too did she instigate the modification of Lesey's will and intervivos trust, according to the Kinsels, to benefit herself.

The trust held substantial portions of Lesey's property, including the aforementioned interest in the ranch. Under its terms, various descendants or heirs of E.A. were to receive the ranch property upon Lesey's death. Included within that group were J. Frank, Sr., Virginia, J. Frank, Jr. (referred to as Jeff), Carole and Catherine. Lindsey was a residual beneficiary under the instrument.

Once Lesey was under the care or supervision of her niece, there arose discussions concerning the sale of the ranch. Around the same time, Lindsey began investigating the need to hire an attorney for Lesey. Oliver referred her to his son-in-law who was employed by the law firm of Jackson Walker in Austin, Texas. That individual referred her to Branyon who was located in Fort Worth. Lindsey contacted Branyon, who then met Lesey in February 2007. Their first meeting encompassed the modification of Lesey's 2004 last will and testament. By this time, Lesey was ninety-four years old and legally blind. She was also suffering loss of her mental acumen.

Evidence indicates that Lindsey or Oliver began estimating the value of the ranch. Eventually, Lindsey contacted the Kinsels and told them that Lesey needed

3

money and suggested that the ranch be sold. Branyon followed these communications with letters stating that Lesey's living expenses had increased and that "we have investigated the various possibilities available to her in raising some additional cash . . . ." He also said that "the ranch would clearly bring more money for everyone if it were sold intact rather than sold in pieces." What the Kinsels were not told was that Lesey already had approximately $1.4 million dollars in assets available for her care. Upon hearing of the supposed needs of Lesey, each person owning an interest in the ranch agreed to join in the transaction. Though Lindsey testified that Lesey also wanted to sell the property, at least one witness testified that she did not. This same witness testified that Lesey too was being told that she was running short of assets, which information, according to the witness, caused Lesey distress.

Once a buyer was found, Branyon drafted the requisite paperwork for execution by Lesey. Ultimately, the sale was consummated in the summer of 2008. Upon its completion, Branyon sent an email to Lindsey and Oliver saying that they should now open the champagne. Apparently, Oliver also planned a celebration in honor of the transaction.

Proceeds from the sale were divided among the ranch owners. Lesey's share exceeded $3 million and was placed in her trust. As residual beneficiary of the trust, most would pass to Lindsey upon Lesey's death. And, within about a month of the sale, Lesey died. Yet, several days before she did, Branyon presented Lesey with an amendment to the trust effectively deleting any reference as to how her ranch interest was to be distributed upon her death. Lindsey emailed Branyon about the execution of

4

this amendment and hoped "all went well" so she "can quit worrying about a possible lawsuit from the Kinsel grandchildren." Branyon replied with:

> The latest amendment doesn't affect you and I think it might be a good idea for me to keep it in my file and not send anyone (including you) a copy of it at this point. I can't guarantee that someone won't try and contest it after Lesey dies. In fact, I expect it to happen. However, I wlll be able to keep you out of it, and I don't anticipate any problems in defeating any contest that may be filed.

In short, there was no ranch which the Kinsels would inherit. And, believing themselves defrauded and denied their prospective inheritance by Lindsey, Oliver and Branyon, the Kinsels sued for damages. So too did they seek findings that Lesey not only was of unsound mind when she sold the ranch and executed the amendments to her will and intervivos trust but also fell prey to the undue influence of Lindsey, Oliver and Branyon. Though they did not seek to rescind the ranch sale by suing the buyer, they did seek to set aside the sales documents Lesey had signed, along with the 2007 and 2008 amendments to Lesey's will and trust. Also sought was a constructive trust on the sales proceeds.

Trial was to a jury. It found, among other things, that 1) Lesey lacked the requisite mental capacity when executing the ranch sales documents and trust amendments, 2) the Kinsels had been defrauded into selling their interests in the ranch, and 3) Lindsey, Oliver, and Branyon tortiuously interfered with the Kinsels' prospective inheritance. These findings were incorporated into the trial court's final judgment. As a result of them, the trial court, among other things, 1) awarded the Kinsels damages against Lindsey, Oliver, Branyon, and Jackson Walker (jointly and severally), 2) "declared void and of no effect" the Fourth and Fifth Amendments to the Lesey B. Kinsel Trust, 3) declared that the Kinsel Ranch sales contract executed on or about April 15,

5

2008 and the deed of conveyance executed on or about July 22, 2008 were procured as a result of undue influence or the lack of capacity of Lesey B. Kinsel to execute them, 4) declared that the Kinsels were "entitled to the damage amounts listed above [in the judgment] as a result" of the sales contract and deed being procured by undue influence or while Lesey lacked mental capacity to execute them, 5) declared void "any prior deed or document to convey any interest in the oil, gas and minerals from the Trust to Jane O. Lindsey or Robert N. Oliver," 6) imposed a constructive trust "on Jane O. Lindsey's interest in the Trust and any monies that Jane O. Lindsey would be legally entitled to from the Trust . . ." for the purpose of satisfying, "in whole or in part, Plaintiffs' judgment in this lawsuit . . . ," and 7) awarded the Kinsels their attorney's fees of $800,000 per § 27.01 of the Texas Business and Commerce Code, § 37.009 of the Texas Civil Practice & Remedies Code, and § 114.064 of the Texas Trust Code.

All parties timely appealed, and numerous issues pend before us. Yet, several are dispositive of the outcome and we consider them.

### *Tortious Interference With Inheritance Rights*

Lindsey, Oliver and Branyon contend that the trial court erred in awarding damages for their purportedly tortious interference with the Kinsels' inheritance. Allegedly, the issue should not have been submitted to the jury because neither the Texas Supreme Court nor the Court of Appeals for the Second District of Texas (that is, Fort Worth Court of Appeals) has recognized such a cause of action. We agree.

The tort of interference with inheritance rights is described in the Restatement of Torts. We are told therein that someone who "by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift

6

that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift." Restatement (Second) of Torts, § 774B (1979); *see also Urbanczyk v. Urbanczyk*, 278 S.W.3d 829, 835 (Tex. App.—Amarillo 2009, no pet.) (so defining the cause of action while assuming *arguendo* that it was recognized in Texas). Furthermore, various intermediate courts of appeals consider it a recognized cause of action in Texas. *See e.g. In re Estate of Valdez*, 406 S.W.3d 228, 233 (Tex. App.—San Antonio 2013, pet. denied) (stating that "Texas law recognizes a cause of action for tortious interference with inheritance rights"); *Clark v. Wells Fargo Bank, N.A.*, No. 01-08-00887-CV, 2010 Tex. App. LEXIS 4376 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (mem. op.) (stating the same); *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.) (stating the same). Nonetheless, neither our Texas Legislature nor Texas Supreme Court has recognized it. To that category of bodies we also add the Fort Worth Court of Appeals. The latter circumstance is of particular concern since the appeal was transferred from that court to this one by the Supreme Court via a docket equalization order. Given that, we are obligated to abide by and apply precedent of the Fort Worth appellate court (as well as the Supreme Court) when disposing of the appeal. TEX. R. APP. P. 41.3; *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002). Since the Fort Worth Court of Appeals has not recognized the claim, it could be argued that our decision could bind it in future matters. To avoid standing the policy underlying Rule 41.3 on its head by making precedent for the Fort Worth Court of Appeals when we are to follow its precedent, we heed a long standing principle related to the authority of courts of appeals.

7

It is not for intermediate appellate courts to create new causes of action. *Burroughs v. APS Int'l, Ltd.*, 93 S.W.3d 155, 161 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *Bernard Johnson, Inc. v. Continental Constructors, Inc.*, 630 S.W.2d 365, 375 (Tex. Civ. App.—Austin 1982, writ ref'd n.r.e.); *accord*, *Simmons Airlines v. Lagrotte*, 50 S.W.3d 748, 752 (Tex. App.—Dallas 2001, pet. denied) (stating that "[i]t is not for an intermediate appellate court to undertake to enlarge or extend the grounds for wrongful discharge under the employment-at-will doctrine. If such an exception is to be created, the Texas Supreme Court should do it."). Creating a new cause of action is tantamount to creating a new law. Yet, "our State Constitution makes clear that it is the Legislature that promulgates laws and 'the power conferred upon the legislature to make the laws cannot be delegated by that department to any other body or authority.'" *In re City of Georgetown*, 53 S.W.3d 328, 339 (Tex. 2001). Thus, neither this court, the courts in *Valdez, Clark,* and *Russell*, nor the trial court below can legitimately recognize, in the first instance, a cause of action for tortiuously interfering with one's inheritance. Doing so lies within the province of the Texas Supreme Court or the Texas Legislature. And, because the trial court failed to heed that principle, it erred. That the error was harmful is clear because the jury not only found in favor of the Kinsels on that claim but also awarded them damages under it.

In so concluding, we do not ignore the dissent's analysis but rather simply disagree with it. Undoubtedly, other intermediate courts of appeals have recognized the existence of the cause of action. Yet, the Seventh Court of Appeals is not one of them, as exemplified in *Urbanczyk v. Urbanczyk*, 278 S.W.3d 829 (Tex. App.—Amarillo 2009, no pet.). In footnote six of that opinion, we wrote:

8

> The summary judgment motion of Marvin and Janet also asserted that the claim failed as a matter of law because the Texas Supreme Court has not recognized a cause of action for tortious interference with inheritance rights. Disposition of this appeal does not require us to consider whether such a cause of action exists in Texas, and we do not consider that question. Delmer cites our opinion in *Nordyke v. Nordyke*, No. 07-96-406-CV, 1998 Tex. App. LEXIS 55, 1998 WL 4508 (Tex.App.--Amarillo, January 7, 1998, pet. denied) (mem. op.) as recognizing a cause of action for tortious interference with inheritance rights. As our opinion made clear, the existence of the cause of action was not addressed, but only the appellant's contention that limitations barred its assertion. 1998 Tex. App. LEXIS 55, [WL] at *3 n.1.

*Id.* at 835 n.6. The verbiage of that footnote (which happens to be our most recent writing on the subject) does not permit one to logically conclude that tortious interference with inheritance rights has been recognized as a viable cause of action by a majority of this court.

As for reference to our opinion in *In re Estate of Crawford*, 795 S.W.2d 835 (Tex. App.—Amarillo 1990 no writ), we did mention the claim. The passage consisted of our saying that: "By his six cross-points, Bill charges the trial court with abuse of discretion in directing a verdict against him on his causes of action for tortious interference with inheritance rights, breach of fiduciary duty, fraud, bad faith, conspiracy, and imposition of a constructive trust." *Id.* at 841 (emphasis added). Nothing else was said about the matter, though, and we ultimately affirmed the trial court's directed verdict on it and the other itemized causes.

To the extent that the dissent suggests that the Fort Worth Court of Appeals somehow recognized the claim in *Swearingin v. Estate of Swearingin*, No. 02-05-00132-CV, 2006 Tex. App. LEXIS 5187 (Tex. App.—Fort Worth June 15, 2006, no pet.) (mem. op.), *In re Bledsoe*, 41 S.W.3d 807 (Tex. App.—Fort Worth 2011, orig. proceeding), and *Allen v. Havens*, No. 02-05-00318-CV, 2007 Tex. App. LEXIS 2088, at *27 (Tex. App.—

9

Fort Worth March 15, 2007, no pet.) (mem. op.), the suggestion fails to withstand scrutiny. In *Swearingin*, the cause of action was mentioned along with a number of others. Yet, the opinion said nothing of its merits or availability under Texas law. Nor did the claim serve as any basis for recovery. Indeed, the only chose-in-action addressed on the merits was that sounding in breached contract, and the Fort Worth Court of Appeals affirmed summary judgment against the complainant because there was no breach of contract. *Swearingin*, 2006 Tex. App. LEXIS 5187, at *10-16.

Nor were the merits of the claim addressed in *Bledsoe*. There, the court dealt with whether striking Bledsoe's defensive pleadings constituted the levy of impermissible death penalty sanctions. Admittedly, it itemized the various causes of action for which Bledsoe had been sued, and among them was the purported tort at issue here. Yet, the reviewing court said nothing about the viability of any cause-of-action pled. It simply addressed the presence of error in prohibiting Bledsoe from pursuing his affirmative defenses and held "that the probate court abused its discretion in striking [his] fact witnesses, trial exhibits, and proposed jury instructions, definitions, and questions . . . ." *In re Bledsoe*, 41 S.W.3d at 815.

As for *Allen*, the court again mentioned the various causes of action alleged against defendant, and, again, one consisted of tortious interference with an inheritance. *Allen v. Havens*, 2007 Tex. App. LEXIS 2088, at *2. But, the disputes before it dealt not with their viability but with the existence of either subject matter or personal jurisdiction. And, in the end, the reviewing court simply affirmed Haven's special appearance and the dismissal for want of personal jurisdiction over him.

10

Finally, we note that denying a petition for discretionary review carries no precedential weight. That is, the decision to forego such a review cannot be deemed as indicating that the Supreme Court approved of what the intermediate court did. *Loram Maint. of Way, Inc. v. Ianni,* 210 S.W.3d 593, 596 (Tex. 2006). So, contrary to the dissent's insinuation, the Supreme Court's decision to forego discretionary review in *In re Estate of Valdez*, 406 S.W.3d at 233, is no evidence that the Supreme Court has implicitly recognized tortious interference with inheritance rights.

Merely saying the words "tortious interference with inheritance rights" somewhere in an opinion is not tantamount to acknowledging its viability under Texas jurisprudence. This is not to say that the claim at issue should not be recognized. We simply forego the opportunity to create law for another intermediate appellate court via a transfer case, especially when this appellate court has yet to itself adopt that law for disputes arising within its own district. The matter is instead left to the governmental bodies authorized to expand Texas jurisprudence . . . the Texas Supreme Court and the Texas Legislature.

### *Fraud and Damages*

Next, we address the issues concerning fraud. According to Branyon, Lindsey and Oliver, the verdict lacked legally and factually sufficient evidentiary support. So too was the instruction on damages allegedly defective. We sustain the issue in part.

After directing the jury to decide whether fraud occurred, the trial court submitted the following:

> What sum of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would fairly and reasonably compensate [the Kinsels] for the damages, if any, proximately caused by the conduct [committed by the defendants]?

11

* * * * *

Answer separately in dollars and cents for damages, if any.

> a. The value of their present and future interest, if any, in the Kinsel
> Ranch, excluding minerals.

Instructing the jury to consider only the Kinsels' "present and future interest" in the ranch allegedly was an inaccurate measure. We agree.

One falling victim of fraud may recover direct damages and consequential damages. *Arthur Andersen v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex. 1997). Direct damages are those that necessarily and usually arise from the misconduct, and they can be measured as either out-of-pocket loss or the lost benefit-of-the-bargain. *Aquaplex, Inc. v. Rancho La Valencia, Inc.* 297 S.W.3d 768, 775 (Tex. 2009) (per curiam); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). The former is restitutionary in nature and measures the difference between the value of that given and that received. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d at 636; *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998). The latter measures one's expectancy and assesses difference between the value of the property as represented and its actual value. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d at 636*. And, both are determined at the time of the sale or transaction induced by the fraud. *Arthur Andersen v. Perry Equip. Corp.,* 945 S.W.2d at 817.

Consequential damages are damages that result naturally but not necessarily from the wrongful act. *Id.* at 816. Though not the usual result of the wrong, they nonetheless must be foreseeable and directly traceable to and result from the misconduct. *Id.*; *see Formosa Plastics*, 960 S.W.2d at 49 n.1 (stating that "[w]hen properly pleaded and proved, consequential damages that are foreseeable and directly

12

traceable to the fraud and result from it might be recoverable"). And, unlike direct damages, consequential damages may include subsequent losses if those losses were reasonably foreseeable and have the requisite nexus to the wrong. *Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d at 817.

Finally, an instruction failing to inform the jury of the proper measure is defective and subject to reversal. *Id.* (stating that "[b]ecause the charge failed to instruct the jury on the proper measure of direct damages, the submission was reversible error"). With this said, we turn to the circumstances before us.

First, the instruction directed the jury to begin its calculation by considering the "present" and "future" value of the Kinsels' interest in the ranch. Omitted from it was any restriction obligating the jury to focus on values at the time of the fraud. Instead, the jury was told to assess damages based upon values at the time of trial and in the future. So, the directive failed to comport with the Supreme Court's admonishment in *Authur Anderson*; that is, it failed to restrict the calculations to the values applicable at the time of the sale or transaction induced by the fraud.

Second, the Kinsels sought their out-of-pocket loss. To realize this, one need only read the passage in their brief wherein they argued that "[a]warding [them] the 'present and future interest' value in the Ranch proceeds is an appropriate *out-of-pocket measure of damages*." (Emphasis added). As previously stated, out-of-pocket damages constitute the difference between the value of what they relinquished due to the fraud and what they received. And, again, the purported fraud here consisted of being induced to join Lesey in selling their respective interests in the ranch based upon the falsehood that she needed money to subsist. Given this framework, their out-of-

13

pocket damages would be the difference between the value of their interest in the land and the value of what they received from the sale at the time of the fraud. Yet, that is not what the jury was asked to measure. Instead, the trial court told it to measure damages by calculating the difference between the value of their respective present and future interests in the ranch. That this was also the same instruction and measure of damages submitted in relation to the claim for tortuously interfering with their inheritance rights is most telling. Via the latter claim, the Kinsels sought to recover their alleged share of Lesey's interest in the ranch (or its sales proceeds) had it remained in trust at the time of her death in the future. That is not the difference between the value of what they relinquished and received at the time of the fraud.

Again, the jury was not measuring damages based on the fraud perpetrated on the Kinsels, *i.e.* their being induced to sell their respective interests in the ranch via a misrepresentation. It was measuring damages in relation to the loss each experienced due to Lesey amending the terms of her trust. That was improper, and the trial court erred in telling the jury to do so.

The Kinsels attempted to justify the instruction by arguing that "[t]he Defendants also promised . . . as part of their pitch to sell the Ranch, that the proceeds from the sale of the Ranch would be put in a trust and then distributed to [the] Kinsels in shares proportionate with the distribution of the Ranch. Despite those representations, the Defendants neither arranged for that, nor intended to. As a result of the Defendants' actions, they cost the Kinsels that value." Yet, the specific act of fraud or misrepresentation alleged in the Kinsels' live pleading (*i.e.* the eighth amended pleading) and upon which trial was conducted and recovery was sought said nothing of

14

that purported misrepresentation. Nor did the jury charge itself encompass that particular allegation. It simply alluded to a misrepresentation about Lesey's financial needs. We cannot now use some instance of fraud outside the scope of the pleadings and omitted from the charge to supplement or otherwise expand the damages recoverable by the Kinsels. This is especially so when the Kinsels failed to illustrate that the matter was tried with the consent of all involved. *See Hampden Corp. v. Remark, Inc.*, 331 S.W.3d 489, 495 (Tex. App.—Dallas 2010, pet. denied) (stating that matters outside the scope of the pleadings may be deemed as tried by consent when it appears from the record that the issue was actually tried).

As previously mentioned, an instruction submitting the wrong measure of damages is error. And, because it is clear that the damages awarded were founded upon the wrong measure, the error was harmful.

### *Sufficiency of the Evidence*

Next, we address the sufficiency issues urged by Lindsey, Oliver and Branyon. They contend that either no evidence or factually insufficient evidence supports the jury's verdict.[1] The first aspect of the argument we discuss pertains to injury or damage, the second to conspiracy and the third to undue influence and mental capacity.

*Fraud Damages*

To recover for fraud, one must prove that 1) a material representation was made; 2) the representation was false; 3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; 4) the speaker made the representation with the intent that the other

---

[1] The pertinent standards of review are discussed in *City of Keller v. Wilson*, 168 S.W.3d 801 (Tex. 2005) (legal sufficiency) and *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998) (factual sufficiency). We will apply them here.

party should act upon it; (5) the party acted in reliance on the representation; and 6) "the party thereby suffered injury." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co.*, 341 S.W.3d 323, 337 (Tex. 2011). We focus on the last element, that pertaining to injury or damage.

Given that the Kinsels sought to recover their out-of-pocket loss, we searched the record for evidence illustrating the difference between the value of what they relinquished and the value of what they received at the time of the fraud. What each Kinsel relinquished due to the representations in question was the interest each owned in the ranch at the time of the fraud. However, no one cited us to evidence illustrating what the value of that interest was at that time. Nor did we find such evidence of record. Similarly missing was evidence illustrating that the percentage of the sales proceeds each received was less than the value of the interest each sold. One may account for the absence of such evidence by considering what the Kinsels actually sought to recover, that being a share of ranch sales proceeds held in trust for Lesey. But, again, that was an improper measure for out-of-pocket loss.

Because the record contains no evidence of the Kinsels suffering out-of-pocket loss, the verdicts awarding each Kinsel damages for fraud cannot stand. This deficiency of evidence has one other effect. It vitiates the need to remand the fraud claim for a new trial due to the aforementioned inaccurate damage instruction. We so conclude in view of the writings in *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513 (Tex. 2002).

In *St. Joseph*, the dispute involved the theory of joint enterprise, and our Supreme Court was asked to determine whether an aspect of the jury charge was

16

inaccurate. It eventually held that the instruction improperly defined an element of the theory, that element being a community of pecuniary interest in the common purpose among the members of the group. *Id.* at 529. Thereafter, the court was asked to assess whether the verdict encompassing on that particular element enjoyed legally sufficient evidentiary support. The court answered in the negative. *Id.* at 534. This absence of evidence then led the Supreme Court to state: "rather than remand this theory of recovery to the trial court to be retried using the appropriate jury instructions, we render judgment that the Wolffs take nothing against St. Joseph under a joint enterprise theory." *Id.* In other words, the need for a new trial due to the improper jury charge was vitiated by the absence of evidence on that particular element.

So, like the court in *St. Joseph*, we too have found an improperly worded element of the claim defined in the jury charge which normally would require a new trial. Yet, because the record contained no evidence establishing the element (as properly defined), there is no need to remand. Instead, we render judgment denying the Kinsels recovery for fraud.

*Conspiracy*

As for the claim of conspiracy, civil conspiracy is akin to a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 680-81 (Tex. 1996); *accord, Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008) (stating that "[c]onspiracy is a derivative tort requiring an unlawful means or purpose, which may include an underlying tort"); *see also, In re Lipsky*, 411 S.W.3d 530, 549 (Tex. App.—Fort Worth 2013, orig. proceeding) (stating that "[r]ecovery for civil conspiracy is not based on the conspiracy but on the underlying tort"). That is, "a defendant's liability . . . depends on participation in some underlying

17

tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d at 680-81. Our having rejected the claim of tortious interference with inheritance rights and having found no evidence to support recovery for fraud, neither tort may support the jury's finding that Lindsey and the others engaged in a civil conspiracy against the Kinsels. In other words, neither tort provides evidence of a wrong prerequisite to a valid conspiracy finding.

*Undue Influence and Lack of Mental Capacity*

As for the allegations of undue influence and lack of mental capacity, they relate to Lesey's mindset when she sold the ranch and executed the fourth and fifth amendments to her trust. The two amendments were signed on February 23, 2007 and August 12, 2008, while she executed the sales contract and deed on April 15, 2008 and July 22, 2008. Lesey died on August 22, 2008, at the age of ninety-five. The jury found that Lesey lacked legal capacity when each of those documents was signed. It also concluded that Lindsey, Oliver and Branyon exercised undue influence over her when she made those decisions. According to Lindsey, Oliver and Branyon, the findings lacked sufficient legal and factual evidentiary support. We first address the topic of legal capacity.

Documents executed by one who lacks sufficient legal or mental capacity may be avoided. *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 193 (Tex. 2009). To have mental capacity, the person executing the instrument must have had sufficient mind and memory to understand the nature and effect of his act at the time of the document's execution. *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *accord, Sanders v. Sanders*, No. 02-08-00201-CV, 2010 Tex. App. LEXIS 8308,

at *5 (Tex. App.—Fort Worth October 14, 2010, no pet.) (mem. op.) (stating that "[t]o show mental incapacity, a person seeking to set aside an agreement must show that she did not understand the nature and consequences of her act at the time the agreement was made").  Capacity may be assessed by considering such factors as 1) the person's outward conduct demonstrating an "inward and causing condition," 2) preexisting external circumstances tending to produce a special mental condition, and 3) the person's mental condition before or after the relevant point in time from which her mental capacity or incapacity may be inferred. *Sanders v. Sanders*, 2010 Tex. App. LEXIS 8308, at *5-6; *accord*, *Decker v. Decker*, 192 S.W.3d at 652 (stating that evidence of a person's capacity before and after the event in question may be relevant when establishing capacity at the time of the event).  Finally, expert testimony on the matter is not required since the requisite proof regarding mental capacity may reside within the common knowledge and experience of laypersons.  *Decker v. Decker*, 192 S.W.3d at 652.

Here, evidence of record illustrates that as of 2006, Lesey underwent twenty-four hour care.  She was ninety-three years old at the time, and while undergoing such care, she 1) grew more infirm, 2) experienced macular degeneration, 3) became legally blind, 4) had to have others give her the pills she had to take, 5) had to have others manage her doctors' care and her finances, 6) became extremely frail, 7) required assistance in walking, bathing, dressing, and eating, 8) became incontinent of urine or urinated on herself, 9) experienced continual confusion and forgetfulness, 10) experienced agitation, and 11) experienced depression.  So too did she begin to experience congestive heart failure in 2007 and grow less responsive to the medications

19

administered to ameliorate that condition. The condition resulted in her having renal insufficiency or a precursor to renal failure. Consequently, fluid was pooling in her body, and her heart was unable "to clear it out." That, according to a physician who testified, could affect a person's mental state "[w]hen it gets that significant . . . ."

One witness testified that in "late 2006, [Lesey] was clearly becoming more and more confused and forgetful, and she would forget things that she had recently done or did. And that continued into 2007. And I was over there in February of 2007. And we got there and she was very, very agitated and confused." The February date alluded to was the 27th, and the witness recalled Lesey saying that she thought she "'signed something,'" and "'I don't know what I've signed.'" When asked whether she had a copy of the document, Lesey said "no." When asked if she knew "'what it is that you signed,'" Lesey answered "No." The same reply was made when asked if she knew when she signed the document. As previously mentioned, the fourth amendment to Lesey's trust had been signed four days earlier. It was that amendment that separated the surface and mineral estate of Lesey's ranch interest and granted the minerals to Lindsey and Oliver upon termination of the trust.

Other evidence illustrated that Lesey suffered from dementia in 2007. The aforementioned physician opined that by the end of February 2007, Lesey "had mild to moderate dementia and cognitive impairment." She was "losing brain cells and if you keep losing so many, some days your brain cells that you have left function better than other days." Nonetheless, Lesey "still ha[d] a significant limitation." The doctor, further, testified that because of her dementia and cognitive impairment, Lesey "didn't have the mental capacity to understand what -- even to call up an attorney and say she wanted to

contract -- or transact any business, follow through, all that. She didn't have the executive functioning nor the overall mental capacity to do that." And, when asked "when you have good and bad days, does that mean you spike up high enough that you then could execute some sort of contract . . . ," the doctor answered: "[n]o, not with someone with dementia. It may be that you have a day where you can kind of scribble out your signature if someone is telling you to do it, but as far as to overall comprehend and understand, if you think about – no . . . ." Other evidence appears of record describing Lesey's bouts of confusion, dementia, and physical limitations before, during and after the execution of the instruments attacked here.

One can also look at the appearance of her signature over time as evidence of her infirmity. It had degraded to little more than a scribble of three letters when she signed the fifth-amendment days before her death.

The foregoing constitutes some evidence upon which reasonable minds could conclude that Lesey lacked sufficient mind and memory to understand the nature and effect of her acts at the time she executed the trust amendments and sales instruments at issue. And, upon considering the record as a whole, we cannot say that a jury's decision so concluding was overwhelmed by contrary evidence which rendered the finding manifestly unjust or wrong. So, we overrule the sufficiency complaints levied against the jury's verdict finding Lesey mentally incapacitated.[2]

---

[2] Having so upheld that finding, we need not also determine whether the finding that Lesey fell prey to undue influence also had sufficient evidentiary support. This is so because implicit in the concept of undue influence lies the existence of mental or testamentary capacity. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963) (stating that "while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power"). If a person lacks mental capacity to execute a document, it is difficult to say that the exertion of influence by another overcame that person's mental capacity. In either situation, the document is avoidable.

***Admission of Evidence***

Next, we address complaints regarding the decision to admit certain evidence at trial. The evidence consisted of the testimony from doctors Cole and Clayton and from a probate proceeding. While all appellants raise issues regarding the latter evidence, only Lindsey and Oliver question the former. We address each in turn.

*Dr. Cole*

According to Lindsey and Oliver, the trial court abused its discretion in allowing Dr. Cole to testify because the physician "never produced a written report." They also cite *Dennis v. Haden*, 867 S.W.2d 48 (Tex. App.—Texarkana 1993, writ denied) to support their position. In *Dennis,* the trial court ordered the defendants to provide expert reports for all experts they expected to call as witnesses. *Id.* at 50. That was not done for one of the experts, and Dennis objected. The trial court overruled the objection and allowed the expert to testify. On appeal, the reviewing court agreed that it was error because "[t]he trial court's action appears to have occurred in disregard of its own directives." *Id.* at 51. Consequently, it abused its discretion "in allowing [the expert] to testify after [the defendant] failed to obey the court order by not providing a report . . . ." *Id.*

Here, too, the Kinsels were ordered to provide expert reports, which directive encompassed Dr. Cole. They did not. When Lindsey and Oliver objected, though, the trial court refused to permit the doctor to testify as an expert due to the prior order. Instead, it ruled that "the doctor is confined just to his observations that were reflected in his records." It continued by saying: "[a]s far as opinions and so forth that are not

22

reflected in the record, he cannot go there." Lindsey and Oliver, nonetheless, contend at bar that:

> Dr. Cole testified at length regarding Lesey's physical condition, mental state, and medications she was taking at various times—all of which are necessarily the subject of expert testimony and not mere lay witness testimony . . . . Judge Curry's ruling allowed Dr. Cole to testify as to his observations, which were without question shaped by his training as an expert, and were expert opinions.

Other than proffering that conclusory averment, neither attempted to explain why the substance of the doctor's comments caused him to crossover from a fact witness to an expert witness. So too did they fail to cite us to the specific testimony they deemed objectionable. Instead, we were merely referred to forty pages of record and left to parse through it. Lindsey and Oliver apparently forgot that the burden to prove error on appeal was theirs, not ours. We have no obligation to parse through the record in search of tidbits of evidence supporting their argument or otherwise flesh out their skeletal complaint. This is especially so when, as here, the trial court actually sustained objections to aspects of Dr. Cole's testimony that could be considered the rendition of medical or expert opinion.

So too was it their obligation to explain why the evidence they were supposed to cite us to was "necessarily the subject of expert testimony and not mere lay witness testimony." The latter is mere *ipse dixcit* and *ipse dixcit* fails to comply with the mandate of Texas Rule of Appellate Procedure 38.1(i). Per Rule 38.1(i), an appellant must provide clear and concise argument for the contentions made, with appropriate citations to authority and the record. *Watson v. Tipton*, 274 S.W.3d 791, 801 n.31 (Tex. App.—Fort Worth 2008, pet. denied). Because of the inadequate briefing, this aspect of the issue was waived.

*Dr. Clayton*

Next, we consider the complaint of Lindsey and Oliver about the expert testimony of Dr. Clayton. They argue on appeal that the trial court erred in admitting her testimony because 1) "[h]er opinions were not based on knowledge, observation, or opinion as to the mental condition of her own patient," 2) "[a]ll she did was read Lesey's medical records," 3) "[h]er opinions were legal conclusions and invaded both the province of the jury (on the determination of the ultimate fact issue of Lesey's mental condition at the times in question and the weight) and the credibility of the testimony of other witnesses on such matter," 4) "[h]er testimony also directly contradicted the medical records she said she read," and 5) the trial court improperly allowed "Dr. Clayton to testify as to Lesey's susceptibility to undue influence." We overrule the issue.

First we start with the "opinions" that were purportedly "legal conclusions." No specific opinion is mentioned. Nor do Linsdey and Oliver attempt to explain why the unmentioned opinions are legal conclusions. Instead, we are left to delve into the record and choose for ourselves what they may be talking about and then develop our own rationale for why they may be legal conclusions. As previously mentioned, that is not our obligation, but rather the burden of an appellant attempting to comply with appellate rule of procedure 38.1(i). Simply put, this aspect of the issue was waived due to inadequate briefing.

Regarding the complaint about the doctor's opinions not being based on "knowledge, observation or opinion," we again are left to guess at the particular opinions being attacked. While we may be able to offer conjecture about what they may be, Lindsey and Oliver could have easily specified what they were and then explained (as

24

opposed to simply concluding) how they were inadmissible. They did not, and consequently waived this aspect of the issue as well.

As for the opinions invading the "province" of the jury, again . . . which ones; neither litigant specifically mentioned them. Nor did either attempt to explain or illustrate how or why they improperly invaded the "province of the jury." Indeed, experts often opine about matters that arguably invade the jury's province. That tends to be the purpose of expert testimony . . . to opine on matters requiring expertise (that is, to opine on scientific, technical or other matters outside common understanding). *E.g.* TEX. R. EVID. 702 (stating that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise). Furthermore, the rules of evidence provide that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." TEX. R. EVID. 704. So, it is not enough to merely conclude that the expert opinions (whatever they may be) are inadmissible because they invade the jury's province (whatever that may be). Again, this aspect of the issue was waived.

As for the opinions being inadmissible because they were based on the expert's reading of medical records, why an expert cannot develop an opinion based on records goes unexplained. The void seems particularly frustrating because experts may develop opinions based on reading documents provided to them. *E.g.* TEX. R. EVID. 703 (stating that facts or data in the particular case upon which an expert bases an opinion or inference include "those reviewed by" or made known to the expert). So,

again, it is not enough to merely conclude that the expert opinions (whatever they may be) are inadmissible because they were based on medical records reviewed by the expert. Thus, this aspect of the issue was waived.

As for the trial court allegedly erring by "allowing Dr. Clayton to testify as to Lesey's susceptibility to undue influence," the complaint is unaccompanied by citation to authority or explanation. Thus, it too is conclusory, inadequately briefed, and waived.

As for the complaint about the testimony being inadmissible because it was contradictory or contradicted by other testimony, we know of no authority holding that only un-contradicted expert opinions are admissible evidence. Nor do we know of authority holding that if others contradict an expert's testimony the contradiction somehow renders the expert's opinion as unreliable and, therefore, inadmissible. And, interestingly, neither Lindsey nor Oliver cited us to any such authority. Indeed, seldom do expert opinions go un-contradicted in a lawsuit. If that were not true then there would be little need for half the experts in the world. This last aspect of the argument is waived as well.

### *Probate Proceeding*

Finally, Branyon, Lindsey and Oliver contend that the trial court erred in admitting evidence of conduct undertaken by Branyon while attempting to probate Lesey's estate. The conduct consisted of his submitting Lesey's 2004 will for probate and misrepresenting to the probate court that it was her last will and testament. Purportedly, "[t]he evidence had no probative value, and any value it may have had was substantially outweighed by its potential to prejudice [the defendants], and to confuse and mislead the jury." We overrule the issue.

Generally, relevant evidence is admissible. TEX. R. EVID. 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Yet, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, among other things. TEX. R. EVID. 403.

While invoking the principles encompassed by Rules 401, 402 and 403, Branyon, Lindsey and Oliver say little if anything about why Branyon's conduct via the probate of Lesey's will was irrelevant or unfairly prejudicial. Nevertheless, we cannot ignore the fact that Lindsey, Oliver and Branyon were being sued for engaging in a conspiracy, among other things. The conspiracy allegedly encompassed a scheme to manipulate an aging and mentally infirm person (Lesey) into divesting the Kinsels of their beneficial interest in Lesey's trust, converting that interest into liquid proceeds, and ultimately giving the several million dollars involved to Lindsey and Oliver. To effectuate that scheme, Lesey had to execute documents changing the way she previously opted to dispose of her estate and so execute them at a time when her health and mental acumen were failing her (or so the Kinsels sought to establish). One of the documents executed during that time was her 2007 last will and testament. Its execution occurred in Branyon's office, and Branyon allegedly spoke with Lesey the day of its execution. Yet, upon Lesey's death, Branyon opted to probate a last will and testament she executed in 2004. In so filing that item for probate, he represented to the probate court that it was never revoked. And, at the trial of this cause, he testified that he "believe[d] that it [the 2004 will] was her last will that had not been revoked," despite assisting

27

Lesey execute the 2007 will three years later. When asked if "one of the reasons you couldn't revoke a will is if you didn't have any capacity . . . ," Branyon admitted: "[y]es, that's one reason." When asked if "one of the reasons you [Branyon] could have filed it [the 2004 will] in this particular manner is because Lesey didn't have the capacity to execute the will or any other document on February 23rd, 2007," Branyon admitted that "[t]hat's a possible explanation." These admissions implicate an issue incremental to the validity of claims asserted by the Kinsels. The issue of which we speak is Lesey's mental capacity (or lack thereof) to do what Lindsey and the others were having her do. Given this, the trial court had reasonable basis to conclude that Branyon's conduct before the probate court was relevant because it had a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable. . . ." So too could it have reasonably concluded that any risk of unfair prejudice arising from that evidence did not substantially outweigh its relevance or probative value. Branyon's decision to represent in a court of law and to a judge that the 2004 testament was Lesey's last will, could reasonably be interpreted by a fact-finder that he questioned Lesey's competence in 2007, irrespective of his later testimony.

### Constructive Trust

Next, Lindsey and Oliver attack the imposition of a constructive trust on Lindsey's "residuary interest" in Lesey's intervivos trust. They contend that 1) no evidence supports the imposition of the constructive trust, 2) the scope of that trust was overly broad, and 3) the Kinsels had unclean hands due to their participating in the ranch sale while knowing (or while they reasonably should have known) that Lesey lacked testamentary capacity. We sustain the issue in part and overrule it in part.

28

Whether to impose a constructive trust lies within the trial court's discretion. *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 859 (Tex. App.—Fort Worth 2005, no pet.) *citing, Wheeler v. Blacklands Prod. Credit Ass'n.*, 627 S.W.2d 846, 849 (Tex. App.—Fort Worth 1982, no writ) (stating that the scope and application of a constructive trust is generally left to the discretion of the court imposing it); *accord, Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied) (stating the same). Thus, we review the decision under the standard of abused discretion. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d at 736. Under that standard, a decision is wrong when it is arbitrary, unreasonable, or made without regard to guiding legal principles. *Id.*; *Menefee v. Ohman*, 323 S.W.3d 509, 512 (Tex. App.—Fort Worth 2010, no pet.).

That a constructive trust constitutes an equitable remedy and exists to prevent unjust enrichment is clear. *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d at 859. Its availability is generally dependent upon proof of 1) a breach of a special trust, fiduciary relationship or fraud, 2) the wrongdoer being unjustly enriched, and 3) "tracing to an identifiable *res.*" *Id.* Yet, much is dependent on the equities of the circumstances. *Id.* And, those circumstances may serve to broaden the situation in which the relief may be granted.

As our Supreme Court stated in *Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex. 1974), constructive trusts "have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice." *Id.* at 131. Depending on the circumstances, a transaction "may . . . provide the basis for a constructive trust where one party to that transaction holds funds which in equity and good conscience should be possessed by another." *Id.* So too did it state that "there is no unyielding

29

formula to which a court of equity is bound in decreeing a constructive trust, since the equity of the transaction will shape the measure of relief granted." *Id.* The remedy is so flexible that it allows the trial court to "'indulge in presumptions and even pure fiction'" to "'satisfy the demands of justice.'" *Id.*

The rather broad nature of the remedy at issue was further explained by the Fort Worth Court of Appeals in *Wheeler v. Blacklands Prod. Credit Ass'n*. There, we were told that:

> "whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means, or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein. . . ."

*Wheeler v. Blacklands Prod. Credit Ass'n,* 627 S.W.2d 846, 849, (Tex. App.—Fort Worth 1982, no writ) (*quoting,* 4 Pomeroy's Equity, § 1053 (5th Ed)). The court further observed that the form and variety of these types of trusts are "'practically without limit'" and their principle is "'applied wherever it is necessary for the obtaining of complete justice'" even though "'the law may also give the remedy of damages against the wrong-doer.'" *Id.*

Appearing of record here are circumstances that fit within the parameters of *Wheeler* and *Meadows.* Lesey intended to leave her interest in the ranch to the children of her late husband. Her intervivos trust encompassed such an intent. Under it, J. Frank Kinsel, Sr., J. Frank Kinsel Jr., Joe Bob Kinsel, Sr., Catherine Collins, and Carole Edwards were to receive a 10% interest in the realty. The remaining 10%

owned by Lesey was to go to other heirs of E.A. Kinsel. The residuary of the trust was to go to Lindsey. Shortly after Lesey's arrival in Fort Worth, though, Oliver began calculating the value of the ranch. Thereafter, Lindsey engaged an attorney (Branyon) to assist in the sale of that property. To maximize the sale price, Lindsey and Branyon endeavored to have all those owning an undivided interest in the entire acreage to join in the sale. Other evidence appears of record illustrating that in effectuating their purpose, Lindsey and Branyon led the Kinsels to believe that Lesey needed the money. Withheld by Lindsey and Branyon, according to the record, was Lesey's ownership of over a million dollars in liquid, non-ranch related assets available for her care. *See Miller v. Recovery Sys.,* No. 02-12-00468-CV, 2013 Tex. App. LEXIS 11851, at *17 (Tex. App.—Fort Worth September 19, 2013, pet. denied) (mem. op.) (stating that "[s]everal courts of appeals, including this one, have held that a duty to disclose may also arise when a party makes a partial disclosure that, although true, conveys a false impression"); *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 212-13 (Tex. App.—Houston 2001, pet. denied) (recognizing that fraud may arise from the failure to disclose material information when the information actually disclosed conveys a false impression). Believing what they were told, the other ranch owners agreed to sell.

Before the ranch was sold, Lindsey, under the auspices of pursuing Lesey's wishes, arranged for the surface and mineral estates of Lesey's portion of the land to be severed. About this same time, Lesey also happened to decide that the aforementioned mineral interest should go to Lindsey and Oliver, and Lindsey arranged for the amendment of Lesey's trust to effectuate that supposed intent. Once the land was sold, Lindsey and Branyon discussed another modification of the trust to remove reference to

31

E.A.'s heirs as being the ultimate beneficiaries of the land. Once the trust was amended to reflect that change (which happened to be days before Lesey died), Branyon informed Lindsey that he would withhold disclosure of the amendment from others.[3]

That Lesey lacked the requisite mental capacity to effectuate the foregoing transactions and amendments pursued by Lindsey is established by the evidence. That those transactions and amendments resulted in both Lindsey and Oliver reaping much more from their aunt than they would have before she fell under their supervision is also illustrated by the evidence. That those transactions and changes also resulted in the Kinsels receiving much less than what Lesey had written into her trust before being subjected to the care of Lindsey and succumbing to the effects of age, is also beyond reasonable dispute.[4]

As previously mentioned, a constructive trust may be imposed to redress wrong doing and unjust enrichment in accord with principles of equity and justice. *Meadows v. Bierschwale, supra*. Included within its parameters are circumstances wherein title or ownership of realty or personalty is obtained through actual fraud, misrepresentations, concealments, undue influence, the "'taking advantage of one's weakness or necessities,'" or "'under any other similar circumstances which render it unconscientious

---

[3] One Kinsel also testified he wanted to meet with Lesey and Branyon regarding the disposition of the sales proceeds. Lesey allegedly told him that the proceeds were to go to various Kinsel members upon termination of the trust. This testimony may put into context why Lindsey and Branyon endeavored to 1) have Lesey sign the fifth-amendment to the trust that effectively removed reference to the Kinsels' interest in the ranch and 2) withhold the disclosure of that amendment.

[4] Nor can we escape the irony inherent in Lindsey and Oliver arguing here that because the Kinsels knew or should have known about Lesey's incapacity, they should be unable to recover. No doubt Lindsey and Oliver would fall within the same category; after all they purportedly were interacting with their aunt on a rather regular basis. Yet, neither suggest that they should be denied the largesse they happened to reap after Lesey lost her mental capacity to act for herself.

for the holder of the legal title to retain and enjoy the beneficial interest.'" *Wheeler v. Blacklands Prod. Credit Ass'n,* 627 S.W.2d at 846. Those wrongs afford a trial court opportunity to use a constructive trust to divest the legal owner of the property in favor of "'the one who is truly and equitably entitled to the same. . . .'" *Id.* at 849. That said, we conclude that the trial court had before it evidence of record from which it could reasonably deduce that Lindsey and Oliver uttered misrepresentations to the Kinsels and took advantage of Lesey's incapacity for the purpose of reaping personal gain to the detriment of the Kinsels. The trial court did not abuse its discretion by impressing a constructive trust upon those gains in favor of the people who would have received the ranch had the invalid sale and amendments not occurred.

As for the allegation that the constructive trust was overly broad, we agree. Lesey designated Lindsey as the residual beneficiary of her intervivos trust before losing her mental capacity to act. No one denied that. Furthermore, the impropriety at issue encompassed the ranch and its sales proceeds, not the entire trust corpus. Yet, the trial court impressed the constructive trust on "Jane O. Lindsey's interest in the Trust and any monies that Jane O. Lindsey would be legally entitled to from the Trust. . . ." Reading those words as written, one cannot escape the conclusion that they snare more than merely the ranch and its proceeds. That is, the constructive trust encompasses all interests Lindsey had in the intervivos trust, not simply any interest she may have obtained in the ranch and its proceeds.

Again, a constructive trust serves to give property to those equitably entitled to it. To abide by that purpose, the trial court had to fashion a constructive trust encompassing only the property to which the Kinsels were equitably entitled, that is, the

33

ranch and its sales proceeds. In creating a constructive trust exceeding that scope and encompassing all interests Lindsey had in the intervivos trust, the trial court's decision failed to comport with controlling principles of law and constituted an abuse of discretion. We will modify the judgment to correct the error and limit the constructive trust simply to the ranch and its sales proceeds. By "ranch," we mean as it existed before the execution of those trust amendments which Lesey lacked the capacity to execute, and they include the fourth amendment severing the mineral and surface estates.

As for the matter of unclean hands, the Kinsels suggest that it should be rejected since the theory was not affirmatively pled. Yet, it need not have been pled as an affirmative defense according to our Supreme Court. Through *Best Buy Co. v. Barrera*, 248 S.W.3d 160 (Tex. 2007) (per curiam), we were told that the concept is not a matter of avoidance but rather "relates to the equities necessary to determine liability in the first instance." *Id.* at 163. Moreover, knowledge of the improprieties involved is relevant when weighing the equities and determining in whose favor they fall. *See id.* (wherein the equitable claim of money had and received was being pursued and stating that "the defendant was entitled to inquire into individual class members' knowledge and understanding about the disputed charge in order to demonstrate in whose favor the equities weighed"). Apparently, the defendant is free to present any facts and raise any defenses that would deny the claimant's right or show that in equity and good conscience, the claimant should not recover. *Id.*

As for the doctrine of unclean hands itself, it requires one who seeks equity to come with "'clean hands.'" *Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex. App—San

34

Antonio 1983, writ ref'd).  In other words, a court "acting in equity will refuse to grant relief to a plaintiff who has been guilty of unlawful or inequitable conduct with regard to the issue in dispute."  *Id.*  And, the decision of whether a party has unclean hands lies within the trial court's discretion.  *Id.*  Yet, the rule is not absolute.  *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 410 (Tex. 1960); *Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App.—Fort Worth 2006, pet. denied).  Nor can it "be used . . . if the unlawful or inequitable conduct of the plaintiff is merely collateral to the plaintiff's cause of action."  *Grohn v. Marquardt*, 657 S.W.2d at 855; *accord*, *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988) (stating that "[t]he 'unclean hands' doctrine cannot be used as a defense [where the plaintiff's] unlawful or inequitable conduct is merely collateral to her cause of action").

Moreover, the party invoking the doctrine "'must show that he himself has been injured by such conduct . . . .'"  *Omohundro v. Matthews*, 341 S.W.2d at 410, *quoting*, 2 Pomeroy's Equity Jurisprudence p. 99 (4th ed.); *Dunnagan v. Watson*, 204 S.W.3d at 41; *Grohn v. Marquardt*, 657 S.W.2d at 855.  "'The wrong must have been done to the defendant himself and not to some third party.'"  *Omohundro v. Matthews*, 341 S.W.2d at 410.  And, such injury does not exist where the purported wrong actually aided the one invoking the doctrine.  *Id.* (rejecting application of the doctrine invoked by Omohundro and concluding that "[a]ny improper use of information obtained from their employers by Matthews or Thompson aided rather than injured Omohundro and will not prevent recovery here").

Again, the unclean hands broached by Lindsey and Oliver concerned the Kinsels' knowledge of Lesey's mental incapacity when agreeing to join in the sale of the ranch.

Assuming *arguendo* that such constituted a wrong, neither Lindsey nor Oliver discuss how they suffered any injury from it. Rather, the trial court could have concluded, quite reasonably, that the two benefitted from the Kinsels having such knowledge. It was because they joined the sale that Lindsey succeeded in obtaining the large bonanza she sought to keep. So, as in *Omohundro*, the purported wrong committed by the Kinsels "will not prevent recovery here."

### *Attorney's Fees*

Next, we address the issue of attorney's fees awarded the Kinsels. The jury awarded the Kinsels an attorney's fee of $800,000 for work through trial. No award was made for work through appeal to an intermediate appellate court or a petition to the Supreme Court. According to Lindsey, Oliver and Branyon, the trial court purportedly erred in awarding the $800,000 sum because the Kinsels failed to produce written fee agreements when requested through discovery, the evidence was both legally and factually insufficient to support the award, and the Kinsels failed to segregate those fees recoverable by statute from those that were not. We sustain the issue in part.

Regarding the disclosure of fee agreements, it appears from the record that two firms represented the Kinsels or various members of them. One firm had no written fee agreement with its clients, and cannot be faulted for not producing it. The other firm had a short letter agreement with one of the Kinsels, and though the testifying attorney represented that he was "sorry if it wasn't produced," he also said that "*we produced* all our fee agreements." (Emphasis added). The trial court eventually overruled the objection. Though the basis for overruling the objection went unmentioned, the trial court had evidence before it upon which to reject the contention that the agreement was

not produced. Given that, we cannot say that the court abused its discretion in permitting the Kinsels to proffer evidence on the issue of attorney's fees.

As for the sufficiency of the evidence supporting the award, we note that the Kinsels prayed for attorney's fees under § 27.01 of the Texas Business and Commerce Code and § 37.009 of the Texas Civil Practice and Remedies Code. The former provides that anyone who commits fraud in a real estate transaction "shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court." TEX. BUS. & COMM. CODE ANN. § 27.01(e) (West 2009). The latter statute involves declaratory actions and permits the trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015). At trial, mention was also made about the recovery of fees under the Property Code. Arguably, the provision alluded to was § 114.064(a) of that Code, which allows the trial court to "make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just." TEX. PROP. CODE ANN. § 114.064(a) (West 2014). Because we concluded that the trial court erred in granting recovery upon the fraud claim, the scope and application of § 27.01 of the Business and Commerce Code need not be considered here. Instead, we limit our review to the application of § 37.009 of the Civil Practice and Remedies Code, and because the analysis is the same for § 114.064(a) we incorporate it into our discussion of § 37.009.

Whether fees are reasonable and necessary constitutes a question of fact, and their reasonableness and necessity are subject to review "for sufficiency of the evidence." *Sundance Minerals, L.P. v. Moore*, 354 S.W.3d 507, 513 (Tex. App.—Fort

37

Worth pet. denied). Moreover, various factors are considered when analyzing whether a fee is reasonable and necessary. *State & County Mut. Fire Ins. Co. v. Walker*, 228 S.W.3d 404, 408 (Tex. App.—Fort Worth 2007, no pet.). They include such things as: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill required to perform the legal service properly; 4) the likelihood that the acceptance of the employment precludes other employment by the lawyer; 5) the fee customarily charged in the locality for similar legal services; 6) the amount involved and the results obtained; 7) the time limitations imposed by the client or by the circumstances; 8) the nature and length of the professional relationship with the client; 9) the experience, reputation, and ability of the lawyer or lawyers performing the services; and 10) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Id.*

Each of the foregoing indicia, though, need not be established by evidence. *Id.* Indeed, it seems as though minimal evidence is sufficient to support an attorney's fee award. Our Supreme Court's opinion in *Garcia v. Gomez*, 319 S.W.3d 638 (Tex. 2010) tends to exemplify that. The evidence there consisted of an attorney testifying "about his experience" and opining that particular sums for trial and appeal were reasonable and necessary fees. Though acknowledging that the proffered evidence "lacked specifics," the court, nonetheless, concluded that "it was not, under these circumstances, merely conclusory." *Id.* at 641. More importantly, it sufficed to support the award, or as stated by the court, "[i]t was some evidence of what a reasonable attorney's fee might be in this case." *Id.* This was so, in the court's estimation, because an attorney's testimony about the reasonableness of his own fees is unlike other expert

38

witness testimony. *Id.* "Although rooted in the attorney's experience and expertise, it also consists of the attorney's personal knowledge about the underlying work and its particular value to the client." *Id.* The court further noted that the less than specific evidence was not "objectionable as merely conclusory because the opposing party, or that party's attorney, likewise has some knowledge of the time and effort involved and if the matter is truly in dispute, may effectively question the attorney regarding the reasonableness of his fee." *Id.*

Appearing of record here is testimony from legal counsel 1) about their respective experience, 2) generally describing the work performed by each, 3) alluding to the hours expended in preparing, 4) alluding to fees of either $920,000 or $950,000 being reasonable through trial of the cause, a fee of $75,000 being a reasonable fee if the judgment were appealed to an intermediate court of appeals, a fee of $50,000 being a reasonable fee if a petition for review were filed with the Supreme Court, and a fee of $25,000 being reasonable if oral argument before the Supreme Court occurred, 5) mentioning their respective hourly rates, 6) describing in broad terms the factors considered in concluding that the aforementioned fees were reasonable, and 7) opining that they loss opportunity to work on other matters. Though lacking in specifics too, the foregoing equated, at the very least, the quantum of evidence found sufficient by the Supreme Court in *Garcia*. Consequently, we cannot find it insufficient here. Nor can we say that the sum awarded is manifestly unjust when tested against the entire evidence.

As for the matter of segregation of recoverable from unrecoverable fees, that normally is required. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex.

39

2006); *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 521 (Tex. App.—Fort Worth 2009, no pet.). An exception exits, however. It arises when discrete legal services advance both recoverable and unrecoverable claims that are so intertwined that the fees need not be segregated. *Tony Gullo Motors I. L.P. v. Chapa*, 212 S.W.3d at 313-14. The burden to illustrate that the exception applies lies with the fee claimant. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991). And, it is not satisfied by simply suggesting that the causes of action for which fees are and are not recoverable required proof of the same set of facts and circumstances. *Allan v. Nersesova*, 307 S.W.3d 564, 573 (Tex. App.—Dallas 2010, no pet.). In other words, intertwined facts alone do not make unrecoverable fees recoverable. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d at 313-14.

At bar, no one denies that attorney's fees are generally unrecoverable for pursuing common law fraud or the purported claim of tortious interference with inheritance rights. That the Kinsels failed to prove a statutory fraud involving realty (as we alluded to above) also vitiated their ability to recover fees incurred in prosecuting that claim.

Yet, no one denies that fees were recoverable for claims encompassed by the demand for declaratory relief. Within the latter category, fell the validity of the trust amendments and sale of trust property once Lesey became legally incapacitated. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.005 (West 2015) (stating that a "person interested as . . . a . . . devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, [or] mentally incapacitated person . . . may have a declaration of rights or legal relations in respect to

40

the trust or estate . . . to determine any question arising in the administration of the trust or estate, including questions of construction of wills and other writings").

So, what we have before us are circumstances that would normally trigger the duty to segregate. That is, the Kinsels pursued claims for which fees could and could not be awarded. But, to avoid the duty to segregate, their legal counsel described the claims as "inextricably intertwined." In explaining what they meant, one testified that "whatever cause of action the plaintiffs have in this case, the facts basically relate to each of the causes of action. There's not a whole lot of difference between them as far as the facts go. It's the different aspects of the law that apply to the facts that are different, but the facts and basically everything is intertwined and you can't separate those things as between the causes of action." The explanation rings false, however.

Attacking the validity of the trust amendments and Lesey's effort to sell her ranch interest depended upon establishing the status of her own mental abilities. In turn, proving the fraud claims depended upon illustrating not only that Lindsey, Oliver and Branyon uttered false statements to the Kinsels but also that the Kinsels relied on those utterances to their detriment. It mattered not to Lesey's legal capacity whether Lindsey, Oliver and Branyon defrauded the Kinsels. It mattered not to the claim of fraud that Lesey lost her mental ability to act. Simply put, the causes of action were distinct, and facts necessary to prove each did not overlap. In other words, the time and effort expended to prove fraud did not advance the claim regarding Lesey's loss of legal capacity, and vice-versa. And, while the claims may have arisen within a common time period and involved a ranch owned by both Lesey and the Kinsels, that was not enough to render the causes of action inextricably intertwined.

41

The same is also true of the allegation pertaining to tortious interference with inheritance rights. Assuming *arguendo* that it was a recognized chose-in-action, proving it here was not dependent upon or necessarily affected by Lesey's incapacity.

So, the record at bar failed to establish that discrete legal services provided by those representing the Kinsels advanced both claims for which fees were recoverable and claims for which they were not. Segregation was necessary, and the failure to do so obligates us to remand the issue of segregation for new trial. *See AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d at 522 (holding that when segregation is required but not done then remand to calculate the segregated award is necessary).

### *Cross Appeal - Denial of Appellate Attorney's Fees*

There exists one last issue necessitating our attention. It encompasses the jury's failure to award attorney's fees to the Kinsels should they have to participate in appeals to an intermediate appellate court and the Supreme Court. Allegedly, they had proved entitlement to same as a matter of law, and the trial court erred in failing to award the fees despite the verdict. We overrule the issue.

As previously mentioned, legal counsel for the Kinsels opined about what the reasonable fees would be after trial and through appeal to the Supreme Court. Yet, neither attorney testified about the amount of time that would be expended in those endeavors. Nor did either attorney describe 1) their experience in handling appellate matters, their familiarity with appellate matters, 2) the factors they considered in deriving their opinions about the appellate fees, 3) the appellate fee customarily charged in the locality, or 4) the loss of other work they may encounter due to defending or prosecuting an appeal. Nor did either attempt to describe for the jury what was involved in handling

an appeal. To say the least, their opinions on the matter were lacking in specifics to a much greater degree than their opinions pertaining to fees incurred through trial.

To support "an award of appellate attorneys' fees, there must be evidence of the reasonableness of the fees pertaining to the appellate work." *Jones v. Am. Airlines, Inc.*, 131 S.W.3d 261, 271 (Tex. App.—Fort Worth 2004, no pet.). Assuming *arguendo* that the factually unsubstantiated utterances by legal counsel constitute some evidence of what a reasonable appellate fee could be, it hardly proved what such a fee was, as a matter of law. Given the sparse record before it, the jury could well have decided that it was not afforded sufficient basis upon which to calculate reasonable attorney's fees related to subsequent appeals. And, we cannot fault that decision or the trial court's refusal to ignore it. Accordingly, the cross-issue is overruled.

We reverse the judgment of the trial court to the extent it 1) recited that Lindsey, Oliver, Branyon, and Jackson Walker committed or were part of a conspiracy to commit fraud, statutory fraud, and tortious interference with inheritance rights, 2) awarded damages to the Kinsels against Lindsey, Oliver, Branyon and Jackson Walker, jointly and severally, for committing or conspiring to commit fraud, statutory fraud, and tortious interference with inheritance rights, and 3) awarded attorney's fees of $800,000 in favor of the Kinsels. We render judgment ordering that the Kinsels take nothing against Lindsey, Oliver, Branyon, and Jackson Walker for committing or conspiring to commit fraud, statutory fraud, and tortious interference with inheritance rights. We modify Paragraph 4(f) of the judgment to state that the "damage amounts" to which the "Plaintiffs are entitled" are not awarded against Lindsey, Oliver, Branyon or Jackson Walker personally, individually, or jointly and severally, but are payable from the corpus

upon which the constructive trust was imposed.[5]  We modify that portion of the judgment imposing a constructive trust to limit imposition of the constructive trust solely to any interest Lindsey may have in the proceeds from the sale of the ranch and held in the Lesey B. Kinsel Trust at the time of Lesey B. Kinsel's death.  The issue of attorney's fees is remanded to the trial court for further consideration in conformance with this opinion.  In all other things, the judgment is affirmed as modified.

Brian Quinn
Chief Justice

Pirtle, J., dissenting.

---

[5]Paragraph 4(f) of the judgment states:

> The Kinsel Ranch sales contract on or about April 15, 2008 and the deed of conveyance on or about July 22, 2008 were procured as a result of undue influence or the lack of capacity of Lesey B. Kinsel to execute such documents, *and the Plaintiffs are entitled to the damage amounts listed above in Paragraph 4 and its subparts a through d as a result.* (Emphasis added).

The italicized language is somewhat confusing.  In utilizing the phrase "damage amounts," the trial court simply may have been referring to the sums awarded as the amount each "plaintiff" is to recover due to the avoidance of the instruments procured as a result of the lack of mental capacity or undue influence.  Or, the trial court may have meant the "damage amount" represented the damages recoverable from Lindsey, Oliver, Branyon and Jackson Walker because Lesey executed the documents in question due to undue influence or while incapacitated.  The former construction is more reasonable, since claims of undue influence and deficient mental incapacity serve to vitiate the documents touched by those circumstances.  *See e.g., Long v. Long,* 133 Tex. 96, 125 S.W.2d 1034, 1036 (Tex. 1939) (stating that undue influence and mental incapacity are two distinct grounds for avoiding a will); *accord, Truitt v. Byars,* No. 07-11-00348-CV, 2013 Tex. App. LEXIS 6705, at *23 (Tex. App.—Amarillo May 30, 2013, pet. denied) (stating that the two theories are distinct grounds for avoiding an instrument or contract).  We found no cases indicating that they somehow constitute an independent tort for which monetary damages are recoverable.  So too do we note that the trial court said nothing about assessing the "damage amounts" against Lindsey, Oliver and the others individually or jointly or severally.  So, the "damage amounts" alluded to do not impose liability on Lindsey, Oliver, Branyon or Jackson Walker but instead represent each "Plaintiffs'" respective share of the corpus upon which a constructive trust was imposed.