# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 15-0403

═══════════════

VIRGINIA O. KINSEL, AS ATTORNEY-IN-FACT FOR J. FRANK KINSEL,
J. FRANK KINSEL, JR., CAROLE K. EDWARDS,
AND CATHERINE K. COLLINS, PETITIONERS AND CROSS-RESPONDENTS

v.

JANE O. LINDSEY, INDIVIDUALLY AND AS CO-TRUSTEE
OF THE LESEY B. KINSEL TRUST, AND ROBERT N. OLIVER, RESPONDENTS AND
CROSS-PETITIONERS, AND KEITH BRANYON AND JACKSON WALKER, LLP,
RESPONDENTS

═══════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT OF TEXAS

═══════════════════════════════════════════════════════

**Argued February 16, 2017**

JUSTICE BROWN delivered the opinion of the Court.

JUSTICE LEHRMANN did not participate in the decision.

We are asked in this case to recognize tortious interference with an inheritance as a viable

cause of action in Texas. Petitioners and cross-respondents, the Kinsels, argue we already did so

more than sixty years ago. We disagree. Although some of our courts of appeals have recognized the

tort, we have not. And because the Kinsels have an adequate remedy in this case—a constructive

trust imposed on the disputed inheritance—we are not persuaded to consider it here. For that reason

and others explained below, we affirm the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

**I**

This case arises out of the sale of a family-owned ranch. Lesey Kinsel owned 60% of the ranch, and her step-children and step-grandchildren owned various shares of the other 40%. Lesey deeded her share of the ranch to her intervivos trust in 1996. Under the trust's terms, her 60% interest in the surface and minerals would pass to certain of her step-children and step-grandchildren, some of whom already owned interests in the ranch.

Lesey's inheritance allocation changed over time. Under a third amendment to her trust executed in 2004, her 60% share would be split between J. Frank Kinsel, Jeff Kinsel, Carole Edwards, and Cathy Collins. Her estate-planning documents were silent as to what would happen if the ranch were sold during her lifetime. So by default, any ranch-sale proceeds would pass to the trust's residual beneficiary—Lesey's only niece, Jane Lindsey.

Jeff, Carole, Cathy, and Virginia Kinsel, acting on behalf of the late J. Frank Kinsel (the Kinsels), would eventually sue Jane, Lesey's nephew Bob Oliver, attorney Keith Branyon, and his firm, Jackson Walker LLP, over their role in the sale of the ranch a month before Lesey died. The Kinsels argue they were misled by Jane, Bob, and Keith to believe Lesey was running out of money and needed to liquidate the ranch to cover the growing costs of her care. In reality, Lesey had around $1.4 million in marketable securities at her disposal. But if the ranch were sold and the Kinsels' inheritance adeemed, Jane would receive Lesey's share of the ranch-sale proceeds as the trust's

2

residual beneficiary. The Kinsels who owned shares in the ranch argue they would not have agreed to sell if they did not believe it necessary to support Lesey.

The Kinsels argue the scheme to co-opt their inheritance began in 2005 when, at age 92 and losing her eyesight, Lesey moved from her longtime home of Beaumont to an assisted-living facility in Fort Worth. Jane and Bob, Lesey's only living blood relatives, lived in Fort Worth, and the record shows Jane apparently was Lesey's primary caretaker outside of the 24-hour home care she received beginning in 2006. Jane and Bob also began helping Lesey with her finances; Jane wrote checks from Lesey's account to cover her expenses, and Bob began opening her mail and reading financial statements to her.

In August 2006, Jane wrote to Floyd McSpadden, Lesey's longtime estate-planning attorney in Beaumont. The letter mostly covered housekeeping issues regarding Lesey's estate. But she also inquired "whether or not the [ranch] minerals are separate from the land in the case of [Lesey] willing her share of the ranch to some of the Kinsels." In a letter addressed to Lesey, McSpadden responded that the mineral and surface estates had not been severed. On January 24, 2007, Jane indicated in a letter to McSpadden that Lesey wished to separate the mineral estate in her share of the ranch and gift it equally to Jane and Bob. Jane advised McSpadden that Lesey was "thoroughly informed" and "requested [the changes] be implemented by you." If McSpadden had any questions, Jane wrote that he should "contact Lesey by phone."

McSpadden drafted an updated will and a fourth amendment to Lesey's trust. Because Lesey now lived in Fort Worth, he recommended she retain a local attorney to handle their execution. Bob contacted his son-in-law, an attorney with Jackson Walker, who in turn referred Lesey to Keith, an

3

estate-planning attorney in Jackson Walker's Fort Worth office. McSpadden sent the documents to Keith and, because Lesey could no longer read, instructed him to read them aloud to her.

Jane and Bob drove Lesey to Keith's office on February 23, 2007, to execute the fourth amendment. Keith testified it was his first time to meet any of them. Jane and Bob waited in the lobby while Keith met with Lesey for an hour and a half. Keith testified he spent that time evaluating Lesey's mental capacity through conversation, reading the pertinent documents aloud to her, and ensuring she understood and desired the proposed changes. In a letter to McSpadden following execution of the fourth amendment, Keith wrote that Lesey "knew all of the people that she had chosen to benefit and she asserted over and over that she was comfortable with the terms."

Sometime after Lesey moved to Fort Worth, various owners of the ranch broached the idea of selling. There does not appear to be any evidence that the idea originated with Jane, Bob, or Keith, none of whom owned an interest in the ranch. Paul Prince, a part-owner who was in charge of the ranch's upkeep, testified that he, Cathy, and Joe Bob Kinsel, Jr., another part-owner, initially decided to sell. Paul and Joe Bob are not parties to this case, but Cathy testified she only agreed to sell because Jane told her Lesey was running out of the money.

Paul testified he then asked Jane to run the proposal to sell by Lesey. He had spoken with Jane about two months earlier, he testified, and heard her concerns over Lesey's growing expenses. Paul told Jane it was a "perfect time to sell the ranch." He testified that Jane called him back about a week later while she was with Lesey and said Lesey had agreed to sell the ranch. Paul testified he then spoke directly to Lesey on the phone and that she told him that although she was conflicted by

4

her sentimental attachment to the ranch, she acknowledged she could no longer visit and it was time to sell.

With Lesey's agreement, a majority of the ranch's ownership was prepared to sell. Paul ordered an appraisal of the ranch and secured a broker who in turn produced a buyer. Most of the co-owners readily agreed to the offer. With a sales contract Paul signed on the owners' behalf in place, Keith was again contacted in February 2008 to help execute the sale. Keith testified he could not recall who initially brought him into the transaction, but that someone delivered to him a copy of the sales contract and appraisal. His billing records reflect he met with Bob and Jane in February 2008 to review documents regarding the sale. Keith sent letters to all the ranch owners to confirm their respective interests, notify them of the offer, and gauge their desire to sell. In these letters, dated February 15, 2008, Keith stated:

> I represent Lesey Kinsel and the trustee of her living trust with regard to [the ranch]. As you may know, Ms. Kinsel's living expenses, including the care she receives at her home, have increased substantially of late. As we have investigated the various possibilities available to her in raising some additional cash, she has made the decision that she would like to sell the referenced property in Atascosa County.

Keith testified he then met with Lesey at her apartment on February 19, 2008, to discuss the ranch sale. Lesey told him she had grown weary of shouldering the ranch's expenses without help from the other owners, that she was physically unable to visit, and that the offer was too good to pass up. Keith testified he read the terms of the sales contract to her and that she understood them. He further testified he discussed with Lesey the tax consequences of selling during her lifetime as well as the other substantial assets at her disposal. But Lesey wanted to sell.

5

Meanwhile, and despite earlier indications that the Kinsels were coalescing behind the sale, J. Frank Kinsel's family, which included Virginia, Jeff, and Carole, showed signs of holding out. In an e-mail to Virginia and Carole dated February 19, 2008, Jeff wrote that he had urged Keith to "consider putting any monies from [Lesey's] 60% in a separate trust" and that he doubted Virginia would be willing to sell J. Frank's interest "unless she feels that 'we' are protected." Carole responded that she had met with a lawyer who advised her that "we need to find out where the 60% will go and who will control the 60%." Cathy similarly testified that "we were all concerned that if the ranch were sold and everything was converted to cash, that that cash had to be separated between Jane Lindsey's inheritance and our inheritance instead of mingled."

In early March 2008, Jeff visited Lesey at her apartment. He testified she was "scared to death she was running out of money" and "did not know what was going on." Jeff told Lesey that Keith would not speak with him about her affairs and drafted a letter for Lesey to sign authorizing Keith to discuss her estate planning with Jeff. The letter purportedly is signed by Lesey with just her initials, which, according to Jeff, "was all Lesey was able to sign at that time in her life."

Keith testified that he had a phone conversation with Jeff in which Jeff expressed concern about what would happen with Lesey's share of the ranch-sale proceeds. According to Keith, Jeff "threatened to cause [J. Frank Kinsel] not to join in the sale unless I somehow caused Lesey to change her estate planning documents to protect the proceeds for he and his family." Keith testified he would consult with Lesey. But he reminded Jeff that the buyer was willing to purchase Lesey's 60% interest even if others were unwilling to sell.

Keith testified he visited with Lesey the next day about her estate planning as it applied to the ranch-sale proceeds. Lesey said that Keith was not authorized to discuss her plans with Jeff or members of his family. She further told Keith she was "upset" with the Kinsels and that Jeff and his wife were visiting her "all the time, trying to make sure that she was going to leave them their portion of the proceeds." Keith testified Lesey gave him permission to discuss her estate planning only with Jane and Bob. Lesey also told him that she did not want to make any changes to her estate planning at that time.

Virginia eventually agreed to the sale on J. Frank's behalf, and the deal closed in July 2008. Lesey's trust received $3,056,120.65 for Lesey's share, Cathy received $509,067.96, and Virginia received $509,279.44 for J. Frank's interest.[1] Shortly after the ranch sold, Lesey and Keith met to discuss another amendment to Lesey's trust. Keith testified he presented her with a proposed fifth amendment that would have devised the ranch-sale proceeds to the Kinsels in proportion to the trust's ranch-interest bequests under the fourth amendment. But Lesey rejected that draft, opting instead to leave Jeff and Carole $25,000 in cash each. She made no specific bequest to Cathy because, as Keith recollected, "she had just received $509,000 and she felt like Cathy . . . had received her interest." According to Keith, Lesey "was still bothered by all of the contacts, the visits, the phone calls that she received from the Kinsels during the process of the sale of the ranch." Keith prepared the fifth amendment as Lesey had instructed, which included deleting from the trust all

---

[1] Although Jeff and Carole had an inheritance expectancy in the ranch, neither owned an interest when it sold.

7

references to the ranch. Lesey executed it on August 12, 2008. Keith testified he honored Lesey's request to not share news of the amendment with anyone else. She died ten days later.

## II

The Kinsels sued Jane, Bob, Keith, and Jackson Walker, arguing they unduly influenced Lesey and that she lacked capacity to execute the fourth and fifth amendments to her trust or to sell her share of the ranch. They sought damages for tortious interference with their inheritances; statutory and common-law fraud; and conspiracy. The Kinsels also sought imposition of a constructive trust on Lesey's share of the ranch-sale proceeds that flowed to Jane as residual beneficiary.

The jury found for the Kinsels on every claim, awarding a total of $3.056 million—the amount of Lesey's proceeds from the sale—for tortious interference with their inheritances; statutory and common-law fraud; and conspiracy. Each Kinsel was awarded the percentage of the $3.056 million they stood to inherit under Lesey's trust as it existed before the fourth amendment. The trial court entered judgment on the jury's verdict, declaring (1) the Kinsels were entitled to the damages awarded by the jury; (2) Lesey was unduly influenced and lacked mental capacity to execute the sales contract and deed transfer for the ranch; and (3) the fourth and fifth amendments to Lesey's trust are void, as are any documents conveying a mineral interest in the ranch to Jane or Bob. The trial court also imposed a constructive trust on Jane's interest in Lesey's trust and "any monies that Jane O. Lindsey would be legally entitled to from the Trust" for the purpose of satisfying "in whole or in part, Plaintiffs' judgment in the lawsuit." Finally, the trial court awarded the Kinsels attorneys fees of $800,000 but no appellate fees.

On appeal the case was transferred from the Fort Worth to the Amarillo court of appeals. That court reversed the trial court's award for damages for tortious interference with an inheritance on the basis that "neither our Texas Legislature nor Texas Supreme Court has recognized" that cause of action.[2] ___ S.W.3d ___, ___ (Tex. App.—Amarillo 2015) (mem. op.). It also reversed the award for fraud damages, holding the trial court presented the jury with an incorrect measure of damages and no evidence supports the correct measure. *Id.* at ___. Because the court of appeals reversed both of those tort findings, it likewise rejected a derivative civil-conspiracy finding. *Id.* at ___. But the court of appeals affirmed the trial court's judgment that Lesey was mentally incapacitated when she agreed to sell the ranch and executed the fourth and fifth amendments to her trust. *Id.* at ___. The court of appeals also upheld the trial court's imposition of a constructive trust but narrowed its scope to capture only "any interest she may have obtained in the ranch and its proceeds" instead of "all interests Lindsey had in the intervivos trust." *Id.* at ___. As to attorneys fees in the trial court, the court of appeals held the Kinsels failed to segregate legal services for which fees are recoverable from claims for which they are not, and remanded to the trial court for a new trial on attorneys fees only. *Id.* at ___. As to the jury's refusal to award attorneys fees for appeal, the court of appeals held "the jury could well have decided that it was not afforded sufficient basis upon which to calculate reasonable attorney's fees related to subsequent appeals." *Id.* at ___.

All parties except Keith and Jackson Walker appealed the court of appeals' judgment to this Court. The Kinsels urge us to recognize tortious interference with an inheritance as a cause of action

---

[2] A dissenting justice would have followed "the weight and authority of numerous other intermediate appellate courts of this State . . . that have recognized that cause of action." ___ S.W.3d at ___ (Pirtle, J., dissenting).

9

and uphold their recovery or, alternatively, restore their fraud recovery. They further ask we affirm the trial court's award for trial attorneys fees and either render judgment that they are entitled to additional appellate fees or remand the issue to the trial court for retrial.

Jane and Bob argue we have not and should not recognize tortious interference with an inheritance as a cause of action, and that the Kinsels' fraud damages are not cognizable. They alternatively argue there is no evidence of either tort. They further argue no evidence shows Lesey was mentally incapacitated or unduly influenced, and that the trial court abused its discretion in imposing a constructive trust. Finally, they argue we should render judgment that the Kinsels are not entitled to attorneys fees.

## III

### 1. Lesey's mental capacity

We begin with the issue of Lesey's mental capacity because it has bearing on other issues in this case. The jury found that Jane, Bob, and Keith unduly influenced Lesey both to sell the ranch and execute the fourth and fifth amendments to her trust. It also found that Lesey lacked mental capacity to make any of those transactions. The court of appeals, without specifically addressing the jury's undue-influence finding, concluded there is "some evidence upon which reasonable minds could conclude that Lesey lacked sufficient mind and memory to understand the nature and effect of her acts at the time she executed the trust amendments and sales instruments at issue." ___ S.W.3d at ___. We agree.

Documents executed by one who lacks sufficient legal or mental capacity may be avoided. *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 193 (Tex. 2009). Lesey had the mental capacity to

10

execute the documents effectuating the ranch sale and the fourth and fifth amendments to her trust if she "appreciated the effect of what she was doing and understood the nature and consequences of her acts and the business she was transacting." *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969). The proper inquiry is whether Lesey had capacity on the days she executed the documents at issue. *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). But courts may also look to state of mind at other times if it tends to show one's state of mind on the day a document was executed. *See id.*

Lesey began receiving 24-hour care in 2006 at 93 years old. The court of appeals summarized her deterioration in the final years of her life:

> [Lesey] 1) grew more infirm, 2) experienced macular degeneration, 3) became legally blind, 4) had to have others give her the pills she had to take, 5) had to have others manage her doctors' care and her finances, 6) became extremely frail, 7) required assistance in walking, bathing, dressing, and eating, 8) became incontinent of urine or urinated on herself, 9) experienced continual confusion and forgetfulness, 10) experienced agitation, and 11) experienced depression. So too did she begin to experience congestive heart failure in 2007 and grow less responsive to the medications administered to ameliorate that condition. The condition resulted in her having renal insufficiency or a precursor to renal failure. Consequently, fluid was pooling in her body, and her heart was unable to "clear it out." That, according to a physician who testified, could affect a person's mental state "[w]hen it gets that significant."

___ S.W.3d at ___ (alterations in original). Jane and Bob protest that this inventory of primarily physical infirmities has no bearing on Lesey's mental capacity. We agree that not all of Lesey's afflictions suggest she was mentally compromised. Evidence of physical infirmities, without more, does not tend to prove mental incapacity. *See Horton v. Horton*, 965 S.W.2d 78, 86 (Tex. App.—Fort Worth 1998, no pet.). But evidence of physical problems that are consistent with or can

11

contribute to mental incapacity is probative. *See Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983) ("[T]he evidence did not simply demonstrate physical decline. Rather, the contestants produced evidence of physical problems, i.e. occlusion of the carotid arteries, consistent with mental incapacity.").

Testimony about how some of Lesey's physical challenges contributed to her mental incapacity came from Lisa Clayton, a board-certified forensic psychiatrist. Dr. Clayton testified that by February 2007 Lesey had "mild to moderate dementia and cognitive impairment." She added that in 2007 and 2008 Lesey was in the latter stages of congestive heart failure, which led to renal insufficiency. Dr. Clayton testified: "Basically, the fluid was just kind of sitting in her body pooling and her heart wasn't able to beat to clear it out." According to Clayton, a person's mental state can be affected "[w]hen it gets that significant."

Dr. Clayton also disclosed that Lesey kept notes on her doctors, their contact information, and her prescription doses in "very legible" handwriting up until fall 2006, after which Lesey began having "confusion" about her medication. Dr. Clayton testified that beginning in early 2007, nurse and caregiver notes on Lesey indicated "she was confused, she was forgetful. And those began going up until she passed away." Some nurses noted "she was depressed as well as confused and forgetful. Other times they said she was agitated." Dr. Clayton opined that by the end of February 2007, Lesey had neither "the executive functioning nor the overall mental capability" to transact business or sign legal documents. As to Lesey's dementia, Dr. Clayton testified that "as you're losing brain cells and if you keep losing so many, some days your brain cells that you have left function better than other days" but that "you'll still have a significant limitation."

12

Dr. Clayton also noted the deterioration of Lesey's handwriting as evidence of her mental decline. She observed that Lesey's signature got worse on every document relevant to this case that she signed. Indeed, the fifth amendment, signed shortly before her death in 2008, constitutes a scribble of three letters. Dr. Clayton testified: "Even someone with blindness, if they've been signing their name in a certain way, would continue to be able to do that."

The Kinsels testified that well before she executed the fourth Amendment in 2007, Lesey was consistently confused, forgetful, and unable to comprehend conversations and documents. She would ask for a car she no longer owned and could no longer understand jokes. Due at least in part to her loss of vision, she could no longer read, work crossword puzzles, or play board games, all pursuits she once enjoyed. Cathy testified to a "dramatic change in her mental and physical health" beginning in 2006: "She was very forgetful. She was hard to talk to. Just a little disassociative with people." Carole testified that by Thanksgiving of 2006 Lesey was no longer lucid and would talk and respond only in short sentences or by nodding. "She was not the Lesey that I had known my entire life," Carole testified.

Jeff testified that in late 2006 Lesey was "clearly becoming more and more confused and forgetful, and she would forget things that she had recently done or did." Jeff visited Lesey on February 27, 2007, four days after Lesey executed the fourth amendment, and testified she was "very agitated and confused." Lesey told Jeff: "I think I've signed something and I don't know what I've signed." Jeff testified that by 2008, Lesey only sometimes remembered conversations from minutes earlier. He added, "[O]ftentimes I found that she either had not heard what I said or understood it,

or didn't understand it, because I'd have to repeat myself." The jury also heard a recording of a voicemail Lesey left in February 2008 that the Kinsels argue demonstrates her incoherence.

Although Jane maintained at trial that Lesey never lost mental capacity, the jury considered e-mails she wrote potentially indicating otherwise. In an e-mail to Paul Prince dated December 16, 2007, Jane stated, "It turns out Lesey must not have been as lucid as I thought." Jane also sent Keith an e-mail on March 11, 2008, alerting him that Lesey had purportedly granted permission for him to talk to Jeff about her estate planning. Revealingly, Jane wrote: "I doubt Lesey is aware of what she authorized, if anything more than a talk."

We agree with the court of appeals that there is sufficient evidence to support the jury's mental-incapacity finding. Keith's testimony, and that of those who accompanied him on his visits with Lesey, tends to contradict the evidence that Lesey was mentally impaired. And the evidence shows that Keith took his responsibilities seriously and executed his duties carefully and ably. But it is not our place to weigh the testimony adduced at trial. That is the jury's province.

**2. The Kinsels' fraud claims**

The court of appeals further held the trial court erred by instructing the jury to award fraud damages for "[t]he value of [the Kinsels'] present and future interest, if any, in the Kinsel Ranch, including minerals." ___ S.W.3d at ___. Because this is an incorrect measure of damages for a fraud claim and the record contains no evidence of the correct measure, the court of appeals rendered judgment rejecting the Kinsels' fraud recovery. We agree.

The court of appeals construed the Kinsels' fraud claims as seeking out-of-pocket damages; the Kinsels do not refute that characterization. Out-of-pocket damages are measured by the

14

difference between the value of what was given and received. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). As the court of appeals correctly observed, they are determined at the time of the sale or transaction induced by the fraud. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).

The court of appeals correctly concluded that the Kinsels' out-of-pocket damages "would be the difference between the value of their interest in the land and the value of what they received from the sale at the time of the fraud." ___ S.W.3d at ___. The Kinsels who had interests in the ranch sold them and received money in return. Out-of-pocket damages are not designed to contemplate what the Kinsels *hoped* to receive from Lesey's trust if she died without selling the ranch or changing her estate planning.

We acknowledge that the Kinsels urge us to adopt a "flexible" approach to damages to account for the inheritance expectancy they gave up in reliance on misrepresentations that Lesey was running out of money. But we cannot be so flexible as to ignore the constraints of this particular remedy. The trial court's attempt to accommodate the Kinsels' fraud theory results in an unworkable damages model. By the time of trial in 2012, the Kinsels had no present ownership interests in a ranch sold in 2008, nor did evidence show the ranch's present value at the time of trial. Neither did the Kinsels have a future interest in the ranch; they had only an expectancy that they would inherit portions of Lesey's share. The trial court erroneously submitted an out-of-pocket damages instruction to the jury. In response to that submission, the only possible amount of fraud damages is zero.

The trial court's faulty instruction amounted to harmful error. *See Arthur Andersen*, 945 S.W.2d at 817 ("Because the charge failed to instruct the jury on the proper measure of direct

damages, the submission was reversible error."). We further agree with the court of appeals that no evidence in the record supports a correct measure of damages. The record contains no evidence of the value of any of the Kinsels' interest in the ranch other than its sales price. Nor is there any evidence that the proceeds each Kinsel received were less than the value of their interests.[3]

In fairness, the Kinsels could not have been expected to put on such evidence because their fraud theory is based on relinquishment of their expected inheritances, not what was received for the sale of their interests in the ranch. And they concede the "difficulty in fitting lost inheritance damages squarely into one of these [fraud-damages] categories," which they argue "demonstrates that a cause of action for tortious interference with inheritance rights is a more appropriate mechanism for litigating this and similar disputes."

### 3. Tortious interference with an inheritance

The Second Restatement of Torts recognizes that liability can arise when someone "intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received" through "fraud, duress, or other tortious means." RESTATEMENT (SECOND) OF TORTS § 774B (1979). A handful of Texas courts of appeals have expressly recognized

---

[3] The Kinsels argue that if we do not allow their fraud recovery, we should allow them to recover their "undisputed damages" based on the jury's findings that "Defendants unduly influenced Lesey when she lacked mental capacity." We disagree. Undue influence itself is not an actionable tort; consequently, damages are not recoverable based solely on an undue-influence finding. *See* RESTATEMENT (SECOND) OF CONTRACTS ch. 7 topic 2, Introductory Note (1981) ("[D]uress and undue influence . . . are not generally of themselves actionable torts . . . ."). Rather, an undue-influence finding typically is grounds for setting aside an otherwise binding document, in this case a trust or deed. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963) (undue influence is a ground for invalidation of a will).

tortious interference with an inheritance as a cause of action.[4] Two courts—the Amarillo court of appeals in this case and the Austin court of appeals—have declined to recognize it on the basis that intermediate courts of appeals should not create new causes of action.[5]

The Kinsels argue this Court recognized the tort nearly seventy years ago in *Pope v. Garrett*, 211 S.W.2d 559 (Tex. 1948), and that the Legislature has done so by statute. We disagree. Neither our precedent nor the Legislature has blessed tortious interference with an inheritance as a cause of action in Texas. Its viability is an open question. The Texas appellate courts that have recognized the tort largely relied on *King v. Acker*, 725 S.W.2d 750 (Tex. App.—Houston [1st Dist.] 1987, no writ). The *King* court noted that Texas "seems" to recognize the cause of action and accepted the argument that we impliedly recognized it in *Pope. Id.* at 754. But this is an inaccurate reading of our precedent.

In *Pope*, a gravely ill woman who had no will attempted to execute one devising all her property to a friend. 211 S.W.2d at 559–60. Two of her heirs-at-law prevented her from doing so by "physical force or by creating a disturbance," and she died intestate shortly thereafter. *Id.* The Court upheld a constructive trust imposed on the property that passed intestate to the decedent's heirs. We observed the case was "a typical one for the intervention of equity to prevent a wrongdoer, who by his fraudulent or otherwise wrongful act has acquired title to property, from retaining and enjoying

---

[4] *See, e.g.*, *Stern v. Marshall*, 471 S.W.3d 498, 516 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Magana v. Citibank, N.A.*, 454 S.W.3d 667, 685 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re Estate of Valdez*, 406 S.W.3d 228, 233 (Tex. App.—San Antonio 2013, pet. denied); *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.).

[5] *See Anderson v. Archer*, 490 S.W.3d 175, 179 (Tex. App.—Austin 2016, pet. filed) ("To permit the Archers to recover here would, similarly, raise a litany of questions regarding the contours and scope of the cause of action—questions that should properly be resolved by the Legislature or Texas Supreme Court first.").

the beneficial interest therein, by impressing a constructive trust on the property in favor of the one who is truly and equitably entitled to the same." *Id.* at 560. *Pope* did nothing to create a stand-alone tort. It simply concluded the facts gave rise to one of the "numberless" instances in which a court, acting in equity, might impose a constructive trust on property obtained "through bad faith and unconscientious acts." *Id.* (quotations omitted).

Nor are we persuaded that the Legislature has statutorily created the cause of action. The Kinsels point us to section 54.001(a) of the Estates Code, which provides: "The filing or contesting in probate court of a pleading relating to a decedent's estate does not constitute tortious interference with the inheritance of the estate." This statute conceivably implies that the Legislature believes the tort is available under Texas law. Indeed, as some courts of appeals have recognized the cause of action, it is no surprise the Legislature acted to limit its application. This legislative limitation, however, cannot be construed to establish a cause of action, nor is it controlling of our decision on whether it exists at common law. Barring more explicit legislative action, the question of whether the tort should exist under Texas law is ours to answer.

We take a host of factors[6] into account when considering a previously unrecognized cause

---

[6] "When recognizing a new cause of action and the accompanying expansion of duty, we must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex. 2003); *see also Ritchie v. Rupe*, 443 S.W.3d 856, 878 (Tex. 2014) ("The analysis is complex, requiring consideration of a number of non-dispositive factors including, but not limited to: the foreseeability, likelihood, and magnitude of the risk of injury; the existence and adequacy of other protections against the risk; the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the persons in question; and the consequences of imposing the new duty, including whether Texas's public policies are served or disserved; whether the new duty may upset legislative balancing-of-interests; and the extent to which the new duty provides clear standards of conduct so as to deter undesirable conduct without impeding desirable conduct or unduly restricting freedoms." (internal marks altered)).

of action. Not the least of them is the existence and adequacy of other protections. *See Ritchie v. Rupe*, 443 S.W.3d 856, 879–82 (Tex. 2014). In this case, the Kinsels secured judgments holding Jane, Bob, Keith, and Jackson Walker personally liable for fraud and tortious interference with their inheritances. But the trial court also imposed a constructive trust on the funds Jane inherited from Lesey as the trust's residual beneficiary. Provided the trial court acted in its discretion in doing so, an issue we separately address below, we see no compelling reason to consider a previously unrecognized tort if the constructive trust proved to be an adequate remedy.

The jury viewed the Kinsels' damages as equal to the amount of Lesey's share of the ranch-sale proceeds the Kinsels would have inherited had the ranch not been sold during her lifetime. Whether it was answering the damages question for common-law fraud, statutory fraud, or tortious interference with an inheritance, the jury entered the same amount: a total of $3.056 million divided by each of the Kinsels' expected inheritances. And because Lesey's share of the ranch-sale proceeds flowed to Jane on Lesey's death, the trial court imposed a constructive trust on "any monies that [Jane] would be legally entitled to from the Trust." ___ S.W.3d at ___. The court of appeals narrowed the constructive trust's reach to include just the ranch-sale proceeds. *Id.* at ___. So as modified by the court of appeals, the constructive trust is imposed on exactly the amount of money the jury believed the Kinsels were entitled to under any theory of recovery.

The Kinsels acknowledge the proceeds held in constructive trust are "the same" as the damages the jury awarded for fraud and tortious interference with their inheritance expectancies. But they argue this remedy is inadequate because Jane has depleted the trust to pay attorneys for the

defense of this lawsuit. According to them, less than $2 million of the original $3.056 million remains.

The parties litigated this issue in the trial court. They initially signed a Rule 11 agreement on October 1, 2008, under which Jane agreed "not to make any payments out of the Lesey B. Kinsel Trust except to pay taxes, trustee fees, . . . and attorneys fees associated with the administration of the Lesey B. Kinsel Trust or the defense of the Lesey B. Kinsel Trust in this lawsuit until there is a final judgment." About a year before trial, however, the Kinsels filed a motion to recoup trust funds used to pay attorneys, which the trial court denied. The Kinsels filed a motion for reconsideration after trial but before the trial court entered judgment on the jury's verdict. The trial court granted that motion in part, ordering only that no further payments be made from the trust. The Kinsels did not appeal the trial court's ruling on either motion.

Under these circumstances, the constructive trust was an adequate remedy even if it ultimately does not provide the full measure of relief the jury awarded. This is not a case in which the law simply does not address the Kinsels' injury. That might be the case if our inquiry were limited to the Kinsels' fraud theory, which we have already held was not viable because it presents a measure of damages incompatible with that cause of action. But we are not turning the Kinsels away on an academic distinction; the law provides other avenues for relief. A constructive trust on the money in question acknowledges and provides redress to the Kinsels' injuries.

If the constructive trust ultimately does not provide full relief, it is not because it is inherently inadequate to redress this wrong. The Kinsels seem to have agreed, initially at least, to allow Jane to use trust funds to pay attorneys to defend this case. They twice moved the trial court to order Jane

to replenish those spent monies. The trial court declined to do so. We have no comment on the correctness of those rulings; they are not before this Court. But the fact that the Kinsels were able to argue for replenishment of the trust partially demonstrates the adequacy of the constructive trust as a remedy. That they were unsuccessful in convincing the trial court to do so is not a persuasive argument for this Court to recognize a new cause of action.

We acknowledge that any shortfall in the Kinsels' recovery could be overcome by expressly recognizing tortious interference with an inheritance as a cause of action, which would make Jane, Bob, Keith, and Jackson Walker jointly and severally liable to the Kinsels.[7] It would then be irrelevant how much the constructive trust does or does not capture, provided the Kinsels could recover from those parties directly. But the question as we see it is not whether we can increase the Kinsels' recovery, but whether the facts of *this* case warrant an enlargement of our body of tort law. We do not believe they do. The law provides an adequate remedy in this case; the Kinsels simply were unsuccessful in fully attaining it.

### 4. Imposition of a constructive trust

Jane and Bob argue, however, that imposition of the constructive trust was itself an abuse of discretion. The court of appeals disagreed but narrowed the constructive trust's scope. We agree with the court of appeals that the trial court acted within its discretion in imposing a constructive trust. However, the Kinsels did not specifically appeal the court of appeals' decision to narrow the constructive trust's scope. We therefore have no basis to consider whether that court acted properly in doing so.

---

[7] We assume, for the sake of argument, sufficient evidence supports the jury's finding.

"A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (citing *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974) ("Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice.")).

Jane and Bob argue the trial court abused its discretion because Lesey's gifts of shares of the ranch were adeemed when the ranch was sold. They further argue there was no "confidential relationship" between Jane and the Kinsels nor any evidence that Jane defrauded Lesey. The first point misses the entire theory of the Kinsels' case: they were convinced to sell the ranch and give up their prospective inheritances under false pretenses. It is precisely because their inheritances were adeemed that the Kinsels brought this action. The second point views the permissible bases for a constructive trust too narrowly. It is true that we recently recognized that a "breach of a special trust or fiduciary relationship or actual or constructive fraud" is "generally" necessary to support a constructive trust. *Id.* But in that same case we reaffirmed our statement in *Pope* that "[t]he specific instances in which equity impresses a constructive trust are numberless—as numberless as the modes by which property may be obtained through bad faith and unconscientious acts." *Id.* (quoting *Pope*, 211 S.W.2d at 560).

In *Pope*, the decedent's heirs-at-law prevented her from executing a will leaving her estate to a friend. We had "no difficulty" approving of the constructive trust imposed by the trial court, calling the case "a typical one for the intervention of equity to prevent a wrongdoer, who by his fraudulent or otherwise wrongful act has acquired title to property, from retaining and enjoying the

22

beneficial interest therein, by impressing a constructive trust on the property in favor of the one who is truly and equitably entitled to the same." *Pope*, 211 S.W.2d at 560. There was no need to establish a "special trust or fiduciary relationship" between the intended beneficiary and the heirs-at-law or establish that the heirs-at-law defrauded the decedent. Neither finding would be applicable to the facts at hand, and the justification for a constructive trust is not so constrained. *See Meadows*, 516 S.W.2d at 131 ("[T]here is no unyielding formula to which a court of equity is bound in decreeing a constructive trust, since the equity of the transaction will shape the measure of relief granted.").

Finally, Jane and Bob argue the Kinsels' "unclean hands" prevent them from seeking equitable relief. Jane and Bob argue the Kinsels knowingly proceeded with the ranch sale aware of Lesey's mental state, and that those who owned shares of the ranch already profited handsomely from the sale. But a party relying on the "unclean hands" doctrine must show that she herself suffered because of the opposing party's conduct. *See Omohundro v. Matthews*, 341 S.W.2d 401, 410 (Tex. 1960). In other words, Jane must show she was harmed by the Kinsels' decision to agree to the sale despite their awareness that Lesey lacked capacity to do so. And she cannot do so. As residual beneficiary to Lesey's trust, Jane benefitted from the ranch sale. Indeed, the entire theory of the Kinsels' case is that Jane manipulated them to sell in order to increase her share under Lesey's trust. As such, any malfeasance on the Kinsels' part is collateral to the basis on which the Kinsels seek equitable relief. *See Davis v. Grammar*, 750 S.W.2d 766, 768 (Tex. 1988) ("The 'unclean hands' doctrine cannot be used as a defense if [the] unlawful or inequitable conduct is merely collateral to [the] cause of action.").

With Jane's objections dispatched, we conclude the trial court acted within its discretion in imposing a constructive trust. We have already held that the jury's finding that Lesey lacked mental capacity to execute the fourth and fifth amendments to her trust and to execute the ranch-sale documents is supported by the evidence. The jury also found that Lesey was unduly unfluenced by Jane, Bob, and Keith[8] in executing those documents. As previously discussed, the court of appeals concluded sufficient evidence supported the mental-incapacity finding, but for reasons it did not explain, it did not separately consider the undue-influence finding. On appeal to this Court, Jane and Bob challenge the court of appeals' disposition of the mental-incapacity finding but not the undue-influence finding. As such, we have no basis to review it here. We hold the mental-incapacity finding, coupled with the undue-influence finding, provided a more than adequate basis for the trial court to impose a constructive trust.

**5. Attorneys fees**

Both the Kinsels and Jane and Bob appealed the court of appeals' disposition of the attorneys-fees issues. Jane and Bob argue no evidence supports an award to the Kinsels for trial or appellate attorneys fees. The Kinsels argue the court of appeals erred by remanding their $800,000 award for attorneys fees through trial to the trial court for reconsideration and by affirming the judgment for no attorneys fees for appeals. We agree with the court of appeals' holdings.

---

[8] Although he did not appeal the jury's undue-influence finding, Keith argues in response to a separate issue that there is no evidence he unduly influenced Lesey. We agree. Keith did not prepare the fourth amendment nor did he meet Lesey until the day he assisted with its execution. There is no evidence at all that he exerted any influence over Lesey in signing it. Moreover, a majority of the ranch owners, including Lesey, had already agreed to sell, and Paul Prince had signed a sales contract on their behalf, before Keith was contacted to assist with the transaction. Nor is there any evidence Keith exercised undue influence on Lesey to execute the fifth amendment to her trust. None of these transactions benefitted Keith personally.

24

Based on its reversal of the Kinsels' fraud and tortious-interference-with-an-inheritance recoveries, the court of appeals correctly concluded the Kinsels could only recover attorneys fees under the Uniform Declaratory Judgment Act, which permits a trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. The determination of reasonable and necessary attorneys fees is an issue generally left to the trier of fact. *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 547 (Tex. 2009). A reviewing court may not simply substitute its judgment for a jury's. *Id.* The party seeking recovery bears the burden of proof to support the award. *Id.*

To support its claim for attorneys fees, counsel for the Kinsels testified regarding legal services rendered and various work performed through trial, each attorney's related experience, and what factors each considered to determine a reasonable fee. Although the court of appeals found this testimony "lacking in specifics," it was "at the very least, the quantum of evidence found sufficient" by this Court in *Garcia v. Gomez*, 319 S.W.3d 638 (Tex. 2010). ___ S.W.3d at ___. We agree.

The court of appeals further correctly recognized that a claimant must segregate legal fees accrued for those claims for which attorneys fees are recoverable from those that are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). Here, the reversal of the Kinsels' fraud and tortious-interference-with-an-inheritance recoveries negates an award for attorneys fees in pursuit of those claims. Accordingly, to recover attorneys fees, the Kinsels were required to segregate work relating to recoverable and non-recoverable claims. An exception exists only when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible. *Id.* at 313–14.  But "it is only when discrete legal services advance both a

25

recoverable and unrecoverable claim that they are so intertwined that they need not be segregated."

*Id.*

Counsel for the Kinsels testified the claims were "inextricably intertwined," such that "whatever cause of action the plaintiffs have in this case, the facts basically relate to each of the causes of action." ___ S.W.3d at ___. But the court of appeals observed that some of the Kinsels' claims addressed the "status of [Lesey's] mental abilities" while others depended on a showing that Jane, Bob, and Keith "uttered false statements" and that the Kinsels relied on those statements. *Id.* at ___. As such, "the causes of action were distinct, and facts necessary to prove each did not overlap." *Id.* at ___. We agree.

A failure to segregate attorneys fees does not preclude an attorneys-fees recovery. *Chapa*, 212 S.W.3d at 314. The issue may be remanded to the trial court for reconsideration with sufficiently detailed information for a meaningful review of the fees sought. *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam). But the parties dispute whether any documentation of the Kinsels' legal fees exists. The Kinsels assure us that counsel maintained appropriate time records for legal services provided, while Jane and Bob argue a remand on this issue alone would be a waste of judicial resources and that we should render judgment that the Kinsels are not entitled to attorneys fees. But even if contemporaneous records are unavailable, we have allowed for reconstruction of an attorney's work and consideration of any evidentiary support of the time spent and tasks performed. *See Chapa*, 212 S.W.3d at 314. We agree with the court of appeals that a remand to the trial court for reconsideration of the attorneys-fees award, consistent with the opinions of the court of appeals and this Court, is proper.

26

Finally, we agree with the court of appeals that "[g]iven the sparse record before it, the jury could well have decided that it was not afforded sufficient basis upon which to calculate reasonable attorney's fees related to subsequent appeals." ___ S.W.3d at ___. As the court of appeals observed, counsel offered a bare assertion of reasonable fees for appellate work through appeal to this Court. *See id.* The court of appeals concluded that testimony was "lacking in specifics to a much greater degree than their opinions pertaining to fees incurred through trial." *Id.* Based on our review of the record, we agree. The jury could have reasonably awarded no attorneys fees for appeals based on the evidence offered at trial.

\* \* \*

For the reasons explained above, we affirm the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED: May 26, 2017