# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00341-CV

**Downstream Investments, LLC, Appellant**

**v.**

**Jay Krcmar as Guardian of The Estate and Person of Holly Latham Bonin, Appellee**

### FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
### NO. 23-O-362, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises out of a canceled contract for the sale of land between a seller, Holly Latham Bonin, and buyer, appellant Downstream Investments, LLC. Appellee Jay Krcmar, as Guardian of the Estate and Person of Holly Latham Bonin, canceled the property sale after his appointment as Bonin's guardian.

Downstream sued Krcmar in his capacity as guardian, seeking specific performance of the purchase contract. Krcmar filed a traditional motion for summary judgment, asserting that he conclusively established all elements of the affirmative defense of mental incapacity. The trial court granted the motion and ordered the contract void. Downstream appeals. For the reasons explained below, we reverse the order granting summary judgment and remand the case to the trial court for further proceedings.

## BACKGROUND[1]

Bonin owns a 95-acre property in rural Caldwell County, Texas ("Property"). The Property is composed of 4 parcels and a two-story house that had been purchased by Bonin and her late husband Wayne Latham. According to Krcmar, Bonin and Latham had lived on the Property since 1992. Krcmar is Bonin's son. Bonin remarried and was living on the Property with her current husband, Bobby Bonin, at the time of the events giving rise to this suit.[2]

In 2022, Bonin was sixty-two years old and had several serious health conditions and significant physical disabilities, including bilateral below-the-knee amputations. On April 12, 2022, she suffered her second major ischemic stroke. According to her medical records from the inpatient-rehabilitation facility where she was admitted on April 20, 2022, she had "a history of diabetes mellitus, hypertension, hyperlipidemia, peripheral artery disease with history of bilateral below-knee amputations, ischemic stroke in the past with residual right hemiparesis, paroxysmal atrial fibrillation for which she is status post a watchman procedure and also has history of GI bleed." She also has chronic kidney disease. The same medical record assessing her status on admittance stated that Bonin's "imaging revealed multiple bilateral small ischemic infarcts." Her "[s]trokes were felt to be embolic" and "[t]here was no clear source of thrombosis," meaning the blood clots causing the strokes traveled from elsewhere in the body, as opposed to their being caused by a blockage in the brain.

Her initial assessment by the speech-language pathologist at the rehabilitation hospital concluded that the impairment of her attention and concentration was moderate ("unable

---

[1] The facts in this section are derived from the parties' pleadings and the summary-judgment evidence. We note those facts that are disputed.

[2] For clarity, we refer to Bobby by his first name.

to focus for extended periods of time, needed more time to process information, and was easily distracted"), the impairment of her memory and executive function was severe ("deficits in short-term memory and working memory" and "deficits in adaptable thinking and planning and self-monitoring"), and the impairment of her reasoning and problem-solving capabilities was moderate to severe. In assessing her reasoning and problem-solving capabilities, the speech-language pathologist concluded "patient is unable to identify problems in everyday situations as well as strategize potential solutions, execute and then evaluate results of those solutions. There are deficits in judgement for safety and decision-making and patient is unable to manage personal finances or medications." The speech-language pathologist performed the Montreal Cognitive Assessment (MoCA) on Bonin, who scored 7 points out of a 30-point maximum.[3] The speech-language pathologist also assessed Bonin's speech impairments and "severe cognitive impairment" as follows:

> These deficits impact the patient's ability to communicate effectively with friends, family, and healthcare providers and others, maintain a reasonable attention span, remember daily life events, and impede her ability to make decisions. Her current deficits could worsen over time and may negatively impact the patient's interpersonal interactions and social relationships, ability to communicate personal information and medical needs in emergency situations, family or household tasks and roles, and safely complete activities of daily living.

Bonin was discharged from the rehabilitation hospital to return home with Bobby on May 12, 2022. The discharge records state that she had "progressed well and is discharging home with outpatient therapy" for rehabilitation. However, the records also indicate that she still required assistance in varying degrees for many self-care functions (including bathing, toileting,

---

[3] Krcmar argues, and Downstream does not appear to dispute, that "[i]t is widely accepted that a 'normal' cognitive score under MoCA requires at lease a twenty-six (26) out of the possible thirty (30)."

and dressing) and for most functional-mobility tasks, although the records state she was "Independent/Modified Independent" for use of her wheelchair.

In mid-October 2022, Bonin and Bobby met with Kathy Blanchard, a licensed real-estate agent, to list the Property for sale. According to Blanchard's affidavit testimony, Bonin told her that she wanted to sell the Property so that she and her husband could buy a handicapped-accessible home. Blanchard attested that after receiving several offers on the Property that she presented to Bonin, Bonin chose Downstream's offer because it was a cash offer that would close quickly. On November 5, 2022, Bonin and Downstream executed a form Farm and Ranch Contract in which Bonin agreed to sell the Property to Downstream for $1,425,000 ("Contract"). Blanchard attested that she went through the Contract with Bonin in person, paragraph by paragraph, before Bonin signed it, and as they went through each paragraph, Bonin stated that she understood it.

Blanchard attested that she showed Bonin six homes after the Contract was signed, and that at each showing, Bonin considered whether the house had adequate handicapped-accessibility features and whether she could maneuver around the house. Blanchard also attested that during her numerous meetings and phone calls with Bonin, Bonin "talked knowledgeably about selling her land and about what she wanted in another home" and that Blanchard "had no indication that Ms. Bonin suffered from any mental impairment."

The sale was originally set to close on December 9, 2022. On December 6, 2022, the County Court of Caldwell County heard Krcmar's application to be appointed temporary guardian of Bonin's person and estate. Bonin testified at this hearing. On December 7, 2022, the county court appointed Krcmar as Bonin's temporary guardian. On December 20, 2022, in

4

reliance on the order granting Krcmar temporary guardianship, Krcmar's counsel informed Downstream "that the proposed closing on December 22, 2022 is cancelled and will not occur."

Two neurologists subsequently conducted physical and cognitive evaluations of Bonin. On December 21, 2022, Neeraj Manchanda, M.D., completed a "Physician's Certificate of Medical Examination," which states "[t]his form is to enable the Court to determine whether the individual identified above is incapacitated according to the legal definition (on page 3), and whether that person should have a guardian appointed." The definition provided quotes Texas Estates Code § 1002.017 and states that an "incapacitated person" means "an adult, who, because of a physical or mental condition, is substantially unable to: (a) provide food, clothing, or shelter for himself or herself; (b) care for the person's own physical health; or (c) manage the person's own financial affairs." Manchanda noted that Bonin had deficits in memory and problem-solving capabilities and concluded that she is unable to "[m]ake complex business, managerial, and financial decisions," among other decisions. He also noted that her "periods of impairment from the [memory and problem-solving] deficits indicated above . . . vary substantially in frequency, severity, or duration." Manchanda evaluated Bonin as being partially incapacitated according to the provided definition of incapacity, meaning that she "lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself or to manage his or her property." He concluded that Bonin "would be able to attend, understand, and participate in the hearing" on her guardianship.

On August 2, 2023, Andrew Alan Collins, M.D. conducted another evaluation of Bonin. Collins's report indicated that Bonin came in with Bobby, who provided the majority of her history. Collins noted that Bonin had "multiple prior ischemic strokes with residual deficits," that her most recent ischemic stroke in April 2022 resulted "in further cognitive impairment from

5

which she partially recovered" but Bobby reported that she had "shown a significant cognitive decline since that hospitalization." Collins repeated the MoCA on Bonin, and she again scored 7 out of a possible 30 points. Collins concluded that Bonin does not have "decision-making capacity for financial or complex life decisions at this time." He added that Bonin "may benefit from further cognitive therapy for the purposes of compensating in activities of her daily life, but both [Bonin] and her husband are very happy with their current living situation."

On August 8, 2023, the county court conducted an evidentiary hearing on Krcmar's application to be appointed Bonin's permanent guardian. Bonin appeared in person and through an attorney ad litem. The court found by clear-and-convincing evidence that Bonin is "a partially incapacitated person, without capacity to do some, but not all, of the tasks necessary to care for herself, to manage her property, to operate a motor vehicle, to vote in a public election, and make personal decisions regarding residence." The court further found that it is in Bonin's best interest to have a permanent guardian with partial authority, and it appointed Krcmar as Bonin's permanent guardian with powers including the power to enforce or protect any of Bonin's property rights, to dispose of her property, and to void any transactions previously entered into but not yet consummated.

On August 9, 2023, Downstream filed suit in district court seeking specific performance of the Contract. In his answer, Krcmar raised mental incapacity as an avoidance or affirmative defense, and he later moved for traditional summary judgment. In his first amended motion for summary judgment, Krcmar argued that Bonin's cognitive evaluation in April 2022, Bonin's testimony at the December 2022 temporary-guardianship hearing, the two subsequent neurological exams, and the two county-court determinations of Bonin's inability to manage her property or financial affairs all conclusively establish that Bonin "did not possess the mental

6

capacity to appreciate the effect of what she was doing or understand the nature and consequences of her acts at the time she executed the Contract." Krcmar also asserted that the county-court orders appointing him temporary and permanent guardian of Bonin provided him with the "power to void any transactions previously entered into but not yet consummated" and conclusively established his legal authority to void the Contract. His summary-judgment evidence included legal descriptions of the Property; Bonin's April-May 2022 medical records; the Contract; Bonin's testimony at the temporary-guardianship hearing; the temporary-guardianship order; Manchanda's December 21, 2022 certificate of medical examination; Collins's August 2, 2023 medical records; and the permanent-guardianship order.

In its response to Krcmar's amended summary-judgment motion, Downstream submitted the Contract with some additional property-tax-valuation documents attached; the December 2022 email from Krcmar's counsel canceling the closing; a March 18, 2024 affidavit from Blanchard, Bonin's realtor; and Downstream's attorney's affidavit verifying the summary-judgment evidence. Referring to both Bonin's testimony at the temporary-guardianship hearing and Blanchard's affidavit, Downstream argued that it had raised a fact issue on whether Bonin "lacked the sufficient memory or mind required to understand the nature or effect of her act at the time the contract was signed." Downstream further asserted that Bonin was not placed under Krcmar's guardianship until after she executed the Contract and that "[a]t the time of the agreement, Holly Latham Bonin was able to act at her own discretion and she fairly negotiated and executed an agreement for which she expressed a desire to enter."

On April 24, 2024, the district court granted summary judgment in favor of Krcmar, finding that Bonin "lacked the mental capacity to enter into a legally enforceable contract on November 5, 2022, because at that time she did not have sufficient mind and memory

7

to understand the nature and effect of her acts," making the Contract voidable as a matter of law. The court further found that Krcmar had authority to void the Contract and successfully voided the Contract on December 20, 2022. Accordingly, the court ordered that the Contract is void.

This appeal followed.

## ANALYSIS

Downstream contends in one issue that the trial court erred in granting summary judgment on Krcmar's affirmative defense of Bonin's mental incompetence to execute the Contract because (1) Krcmar's own evidence establishes the existence of fact issues regarding Bonin's competency, and (2) Downstream's evidence was sufficient to create a fact issue on Bonin's competency. Because we conclude that Downstream's evidence was sufficient to create a fact issue on Bonin's competency, we address only that argument. *See* Tex. R. App. P. 47.1.

**Standard of review**

In a traditional summary-judgment motion, the movant has the burden to show that no genuine issue of material fact exists, and the trial court should grant judgment as a matter of law.[4] *See* Tex. R. Civ. P. 166a(c); *Gill v. Hill*, 688 S.W.3d 863, 868 (Tex. 2024). To establish entitlement to summary judgment based on an affirmative defense—like mental competency— the defendant must conclusively establish each element of its affirmative defense. *See Draughon v. Johnson*, 631 S.W.3d 81, 87-88 (Tex. 2021); *see also* Tex. R. Civ. P. 94 (requiring matters in

---

[4] The Texas Supreme Court recently amended Texas Rule of Civil Procedure 166a, but "[o]ther than the deadline changes, Rule 166a's rewrite is not intended to substantively change the law." Tex. R. Civ. P. 166a cmt., 89 Tex. B.J. 286, 292 (2026). The amendments renumbered the rule's provisions. *See id.* at 289-292. Because the amendments apply only to summary-judgment motions filed on or after March 1, 2026, and the filing of Krcmar's summary-judgment motion preceded the amendments, we refer to the provisions of Rule 166a in effect at the time. *See id.*

8

avoidance or affirmative defenses to be pleaded). The nonmovant must then present evidence raising a fact issue. *First Sabrepoint Cap. Mgmt., L.P. v. Farmland Partners Inc.*, 712 S.W.3d 75, 84-85 (Tex. 2025).

"We review summary judgments de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor." *Id.* at 84 (quoting *Weekley Homes, LLC v. Paniagua*, 691 S.W.3d 911, 915 (Tex. 2024)). "If the credibility of an affiant or deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate." *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). "The weight to be given a witness's testimony is a matter for the trier of fact, and a summary judgment cannot be based on an attack of a witness's credibility." *State v. Durham*, 860 S.W.2d 63, 66 (Tex. 1993).

**Mental Capacity**

Documents executed by one who lacks sufficient legal or mental capacity may be avoided. *Kinsel v. Lindsey*, 526 S.W.3d 411, 419 (Tex. 2017). To establish mental capacity to contract, the evidence must show that, at the time of contracting, the person "appreciated the effect of what she was doing and understood the nature and consequences of her acts and the business she was transacting." *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969). The proper inquiry is whether Bonin had capacity on the day that she executed the Contract. *See Kinsel*, 526 S.W.3d at 419. "But courts may also look to state of mind at other times if it tends to show one's state of mind on the day a document was executed." *Id.* (examining whether sufficient evidence supported jury's mental-incapacity finding).

9

"Circumstantial evidence may be relevant to proving capacity or lack thereof, such as the conduct of the party in question, circumstances tending to produce a particular mental condition, and prior or subsequent existence of a mental condition from which a party's capacity or incapacity at the time in question may be inferred." *In re Estate of Riefler*, 540 S.W.3d 626, 636 (Tex. App.—Amarillo 2017, no pet.) (citing *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi-Edinburg 2004, pet. denied)). However, "[a] person may be incompetent at one time but competent at another." *Dubree v. Blackwell*, 67 S.W.3d 286, 289 (Tex. App.—Amarillo 2001, no pet.). "As a general rule, the question of whether a person, at the time of contracting, knows or understands the nature and consequences of his actions is a question of fact for the jury." *In re Estate of Riefler*, 540 S.W.3d at 636 (citing *Fox v. Lewis*, 344 S.W.2d 731, 739 (Tex. App.—Austin 1961, writ ref'd n.r.e.)).

**Downstream's summary-judgment evidence**

Although we normally would first assess whether Krcmar had carried his summary-judgment burden to conclusively establish that Bonin lacked mental competency to execute the Contract on November 5, 2022, because we agree with Downstream that it has produced summary-judgment evidence that raises a material fact issue on the issue of Bonin's competency on that date, we instead turn to our analysis of that evidence. *See* Tex. R. App. P. 47.1.

In her affidavit, Blanchard attested that she is a licensed real-estate agent who met with Bonin and Bobby at their home in mid-October 2022. She attested that Bonin told her that she wanted to sell the property, that her late husband had bought the property and where the property lines were, and that she wanted to sell the property and house to be able to buy a handicapped-accessible home with amenities like a handicap shower. Bonin also told her she

10

wanted a house "closer to doctor[s'] offices and hospitals since she had to go in for rehabilitation." Blanchard further attested to the following steps leading to the signing of the Contract and to her assessment of Bonin's competency:

> At that [initial] meeting, I discussed with her the comparable prices of like land in that area and how we would market her property. I then presented her with the Listing Agreement and she and I read through each paragraph. As we went through it, she said that she understood each paragraph. She then signed the Listing Agreement.
>
> Shortly after listing the property, I received several offers which I presented to Ms. Bonin. One was from Downstream Interests, LLC. After comparing the offers, [Bonin] said she liked the Downstream offer best because it was a cash offer with no financing requirement and that it would close quickly. That way, she said, they could get into another house sooner. Ms. Bonin and I went through the purchase contract in person and paragraph by paragraph and as we went through each paragraph, Ms. Bonin indicated she understood what it provided by stating so. Ms. Bonin then signed the Downstream contract.
>
> After signing the Downstream contract, we began looking for other homes for Ms. Bonin to buy. I showed Ms. Bonin six homes. Ms. Bonin went inside some of those but only looked from the outside at others since the front doors did not allow access. I understood from my conversations with Ms. Bonin that she then talked to her husband as to how hard it would be to modify to make certain properties more accessible. At each showing Ms. Bonin talked about whether it had adequate handicap features and how she could maneuver around the house.
>
> We made plans to look at some other homes but that was interrupted by her son calling and sending letters to stop.
>
> All during this process, I had numerous meetings and telephone conversations with Ms. Bonin. She talked knowledgeably about selling her land and about what she wanted in another home.
>
> I had no indication that Ms. Bonin suffered from any mental impairment as she was always clear and direct when conversing with me and indicated verbally that she understood the meaning and terms of the Listing Agreement and Sales Contract.

(Paragraph numbers omitted.)

11

Blanchard observed Bonin execute the Contract and opined that she was competent when she did so. In response, Krcmar attacks Blanchard's credibility, asserting that as Bonin's "purported" real-estate agent, "who clearly had nothing to lose if her affidavit does not work, and everything to gain if it does," Blanchard "is the quintessential definition of a self-interested and bias[ed] witness." Krcmar further questions the timing of the listing and sale of the Property, the pricing of the Property, and whether Bonin really sought a more wheelchair-friendly home. All of these questions about Blanchard's credibility highlight why this is a fact issue to be resolved by a factfinder. *See, e.g.*, *Durham*, 860 S.W.2d at 66 ("The weight to be given a witness's testimony is a matter for the trier of fact, and a summary judgment cannot be based on an attack of a witness's credibility."). Summary judgment is inappropriate here where the credibility of various witnesses and the weight to be given their testimony "is likely to be a dispositive factor in the resolution of the case." *Casso*, 776 S.W.2d at 558. As Downstream points out, the question presented is not whether Downstream is entitled to the Property—the question is whether Downstream is entitled to a trial.

Because Blanchard's affidavit is sufficient to raise a material fact issue on Bonin's capacity, we hold that the trial court erred in granting summary judgment, and we sustain Downstream's sole issue.

## CONCLUSION

Having sustained Downstream's sole issue, we reverse the trial court's summary judgment and remand this case to the trial court for further proceedings.

_____

Gisela D. Triana, Justice

12

Before Chief Justice Byrne, Justices Triana and Kelly

Reversed and Remanded

Filed:   May 22, 2026